**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MNA GLOVES SDN BHD**, a Malaysia Private Limited Company,<br><br>Plaintiff,<br><br>v.<br><br>**LONDON LUXURY LLC**, a New York Limited Liability Company,<br><br>Defendant. | **Case No. 7:25-cv-7619**<br><br>**Hon. Cathy J. Seibel**<br><br>**FIRST AMENDED COMPLAINT AND RELIANCE ON JURY DEMAND**<br><br>***A civil action between these parties or other parties directly related to the transaction or occurrence alleged in this Complaint has been previously filed in this Court, where it was given docket number 7:22-cv-00599-CS and was assigned to The Honorable Judge Cathy Seibel. This action was transferred to the United States District Court for the Western District of Arkansas due to a forum selection clause in the contractual agreement between the parties to that action.*** |

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff MNA Gloves SDN BHD ("Plaintiff"), by and through its attorneys, Sohela Suri and Susan J. Deith of Suri Law PLLC, and hereby amends its Complaint[1] against Defendant London Luxury LLC ("Defendant") pursuant to the Minute Entry entered on December 17, 2025[2] and alleges and states as follows:

[1] Pursuant to Local Rule 15.1(a), along with this clean copy of Plaintiff's First Amended Complaint, a true and correct copy of the redlined version of this First Amended Complaint "that shows—through redlining, underlining, strikeouts, or other similar typographic method—all differences from the pleading that it is intended to amend" is attached hereto as Exhibit 21. Local Rule 15.1.

[2] This Minute Entry was entered following the Pre-Motion Conference held with this Honorable Court on December 15, 2025; accordingly, Plaintiff submits this First Amended Complaint without a Motion to Amend pursuant to FED. R. CIV. P. 15.

## I. PRELIMINARY STATEMENT AND INTRODUCTION

1. This is a civil action for declaratory, injunctive, equitable, and monetary relief for damages sustained by Plaintiff as a result of the acts, conduct, and omissions of Defendant in relation to Defendant's breaches of contract, unjust enrichment, and fraud perpetrated against Plaintiff with respect to the Sales Purchase Agreement into which the Parties entered on April 7, 2021 (the "Contract")[3] [4] and the Second Amendment to Sales Purchase Agreement into which Plaintiff and Defendant (collectively the "Parties") entered on August 26, 2021 (the "Second Amendment")[5] [6].

2. Plaintiff is a Malaysia-based company in the business of repackaging and exporting medical gloves.

3. Plaintiff is a B2B company that transacts with North American businesses that re-sell the gloves from Plaintiff to either consumers or other businesses.

4. Plaintiff's sole owner and managing director is Mr. Mohd Nazrul Abdullah ("Abdullah"), a Malaysian businessman of thirty-five (35) years' experience. Abdullah managed all of Plaintiff's business operations and relationships at all material times, and he was the primary

---

[3] A true and correct copy of the Contract is attached hereto as Exhibit 2.

[4] Throughout the Contract and the amendments thereto, Plaintiff is referred to as "Party A" or "Seller," and Defendant is referred to as "Party B" or "Buyer." Please note that while the terms "Seller" and "Buyer" were being used in the Contract, under the agreement between the Parties, Plaintiff was meant to provide Defendant with repackaging and exporting services.

[5] A true and correct copy of the Second Amendment is attached hereto as Exhibit 3.

[6] Upon information and belief, the Second Amendment was titled a "second" amendment to the Contract as a result of a drafting error; the Second Amendment is the first amendment to the Contract. Further, upon information and belief, apart from the Second Amendment, there were no other amendments to or other iterations of the Contract at any time, despite the reference to the "First Amendment to the Sales Purchase Agreement dated April 25, 2021" in the Second Amendment.

point of contact for Plaintiff's customers, including Defendant. Abdullah is also the sole owner of MNA Dynamic Enterprise ("MNA Asia") which he founded in June 2020.

5. MNA Asia is also a B2B company in the business of repackaging and exporting medical gloves; however, it transacts with companies in Asia.

6. Upon information and belief, Defendant is a New York-based company in the business of selling repackaged health and wellness products, such as nitrile gloves. Upon information and belief, Marc Jason ("Jason") is the sole member and Chief Executive Officer (CEO) of Defendant, and Mathilda Laas *aka* Freda ("Laas") is a director of London Luxury Health Private LTD and a representative of Defendant.

7. Upon information and belief, Defendant and Walmart Inc. ("Walmart") entered into an agreement or agreements under which Defendant was to supply a certain amount of nitrile gloves to Walmart. Upon information and belief, Defendant did not manufacture nitrile gloves at the time and required both a manufacturer and also a repackaging company which would repackage the gloves into boxes bearing Defendant's Dr. Smart branding and export them to the United States.

8. Representatives of Plaintiff and Defendant were introduced to one another by a mutual business associate. After the Parties were introduced to one another, the Parties agreed that Plaintiff could assist with Defendant's repackaging and exporting needs with respect to the nitrile gloves Defendant needed to supply to Walmart. The Parties briefly negotiated the material terms of their tentative business arrangement, then Defendant proposed the Contract to Plaintiff.

9. In the course of negotiations between the Parties, the Parties agreed that Defendant would make payments to Plaintiff in advance of Plaintiff fulfilling Defendant's purchase orders, since the cost of goods needed to be advanced to the glove manufacturers. The Parties also agreed

that Defendant would make advance payments to cover the warehousing and storage costs of the nitrile gloves. The Parties' agreement that Defendant was responsible for advancing the aforementioned payments and costs to Plaintiff was a material part of the bargain between the Parties.

10. Additionally, at no point during the negotiations between the Parties did Defendant indicate or otherwise give Plaintiff any reason to believe that Defendant did not have the requisite intellectual property rights or licenses to repackage and resell the specific brand of nitrile gloves Defendant wished for Plaintiff to repackage: Ansell Limited ("Ansell").

11. Under the Contract, Plaintiff's rights and responsibilities, on a monthly basis for a twelve (12) month period, included (1) storing two million (2,000,000) boxes, each of which contained three hundred (300) nitrile gloves from the brand Ansell®; (2) repackaging all of those nitrile gloves into boxes bearing Defendant's Dr. Smart branding of one hundred (100) nitrile gloves each; (3) packing twenty-five (25) boxes into a carton; (4) preparing shipping containers with the cartons of boxes of the repackaged gloves; and (5) exporting the shipping containers to the Port of Los Angeles or another delivery point of Defendant's choosing. In consideration, Defendant would pay Plaintiff the total contract value of Four Hundred Ninety-Three Million Two Hundred Thousand United States Dollars ($493,200,000.00 USD) over the contract term; the price per box of one hundred repackaged nitrile gloves was Six United States Dollars and Eighty-Five Cents ($6.85 USD). Further, under the Contract, Defendant was responsible for securing a letter of credit ("LC") for Forty-One Million One Hundred Thousand United States Dollars ($41,100,000.00 USD) to secure its payment obligations to Plaintiff for one month.

12. Immediately after entering into the Contract, Defendant began impeding Plaintiff's ability to perform under the Contract. Despite Plaintiff's extensive efforts to assist Defendant, for

months Defendant failed to arrange for a manufacturer from which Ansell brand gloves could be sourced. Further, despite Defendant's difficulties with finding a manufacturer, Defendant continued insisting on exclusively sourcing Ansell brand nitrile gloves. Upon information and belief, at the time, Ansell maintained at least one registered trademark and at least one registered patent in relation to those same nitrile gloves. Upon information and belief, Defendant neither had, nor did Defendant take any steps to obtain, any intellectual property rights or licenses to use, repackage, or resell the Ansell brand gloves. Defendant also failed to issue any purchase orders under the Contract for months, even after another manufacturer of gloves was identified when Ansell confirmed Defendant could not repackage and resell its gloves. In fact, in place of making its first purchase order under the Contract, Defendant requested that Plaintiff send a test shipment in or around July 2021 or August 2021. Upon information and belief, Walmart expressed appreciation to Defendant for the test shipment.

13. Yet, in August 2021, Defendant fraudulently induced Plaintiff to enter into the Second Amendment after Plaintiff accommodated the test shipment as a gesture of good faith. Upon information and belief, unbeknownst to Plaintiff, Defendant was planning to set up its own nitrile glove manufacturing operations in the United States and was conspiring with an employee of Walmart to fabricate an increased purchase commitment from Walmart to optimize its own profits, leaving Plaintiff in the lurch. At no material time before Plaintiff executed the Second Amendment did Defendant inform Plaintiff about Defendant's plans to set up its own nitrile glove manufacturing facility in the United States or about the increased order commitment from Walmart, albeit wrongfully obtained. Defendant proposed the Second Amendment to Plaintiff as if it were a requirement in order to maintain the working relationship between the Parties.

14. Worried that Defendant was going to continue breaching the Contract and would not otherwise ever perform, Plaintiff executed the Second Amendment under Defendant's undue influence and as a result of Defendant's fraudulent omissions.

15. Under the Second Amendment, the following amendments were made to the Contract: (1) the value of the contract was reduced to Fifty-Four Million Six Hundred Thousand United States Dollars ($54,600,000.00 USD); (2) the price per box of one hundred (100) repackaged nitrile gloves was reduced to Six United States Dollars and Fifty Cents ($6.50 USD); (3) the monthly volume of one hundred (100) piece boxes to be repackaged, stored, and exported was decreased to seven hundred thousand (700,000) boxes; (4) the requisite value of the LC was reduced to Nine Million One Hundred Thousand United States Dollars ($9,100,00.00 USD); and (5) Plaintiff was required to now adhere to all of Defendant's customer's/customers' compliance, audit, and social audit requirements, or Plaintiff would be in default and the Second Amendment would, by its terms, be rendered null and void.

16. Plaintiff received no consideration for the Second Amendment, nor did Defendant give Plaintiff any commercially reasonable explanation for why the Second Amendment was necessary, nor did the objective circumstances around the Second Amendment and its execution imply any commercially reasonable justification for the Parties to have needed to enter into the Second Amendment. The only explanation was Defendant's ulterior, self-serving motives. The Second Amendment was merely *nudum pactum* and legally unenforceable.

17. Despite Defendant's reduced financial commitment and lower required order volume under the Second Amendment, Defendant continued failing to satisfy its obligations to Plaintiff and also prevented Plaintiff from performing under the Second Amendment despite

Plaintiff remaining ready, willing, and able to perform under both the Contract and the Second Amendment at all material times.

18. Defendant only placed one purchase order under the Second Amendment. However, after placing that purchase order, Defendant failed to pay Plaintiff for the order. In fact, Defendant never paid Plaintiff to procure nitrile gloves, to repackage nitrile gloves, or to export nitrile gloves in connection with the Contract, apart from, *arguendo*, the test shipment in or around July or August 2021, which Defendant, through its agent designated in the Contract, explicitly advised Plaintiff was not a part of the order volume in the Contract nor did it otherwise fall within the scope of Defendant's obligations to Plaintiff under the Contract.

19. In reliance upon Defendant's representations that it would remit payment to Plaintiff and in an effort to not default on its obligations under the Contract and the Second Amendment, Plaintiff obtained financing and sourced the gloves on credit for Defendant, repackaged the gloves, and exported the Gloves to Defendant's designated point of delivery. However, Plaintiff has never received payment for the aforementioned order to this date, nor has Defendant otherwise performed any of its obligations under the Contract or the Second Amendment to date.

20. Ultimately, Defendant failed to satisfy its obligations to Plaintiff under the Contract and prevented Plaintiff from performing thereunder in a variety of ways including, but not limited to: (1) Defendant failing to arrange for or to enable Plaintiff to assist productively in arranging for the nitrile gloves to be repackaged and exported under the Contract for months, (2) Defendant failing to place purchase orders for and remit payments to Plaintiff for nitrile gloves to be obtained, repackaged, stored, and exported under the Contract, and (3) Defendant wrongfully terminating the Contract and fraudulently inducing Defendant to sign the Second Amendment thereafter.

21. This action arises out of Defendant's blatant breaches of its contractual agreement with Plaintiff, and Defendant's deliberate, misleading, and false acts, omissions, and representations to Plaintiff throughout the course of their business relationship which resulted in Plaintiff's being deprived of the benefits of its bargain under the Contract and suffering other damages such as unwarranted expenses associated with obtaining and storing enormous quantities of the nitrile gloves.

## II. JURISDICTION AND VENUE

20. Plaintiff realleges and incorporates by reference each and every allegation contained in the previous paragraphs as if set forth fully herein.

21. This Honorable Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) since this is a civil matter between a citizen of the State of New York and a citizen of the foreign state, Malaysia, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

22. Under Section 8.1 of the Contract, jurisdiction and venue

> shall be governed by and construed in accordance with the laws of Singapore, excepting for the provisions of paragraph 8.3 under this Article 8. Accordingly, in relation to any legal action or proceedings arising out of or in connection with this Contract, each of the Parties hereby irremovably submits arbitration in Singapore as set forth more specifically in Section 8.2 below.

23. Venue in this district is proper under the relevant forum selection clause in Section 8.3 of the Contract which provides for the following:

> With respect to any dispute or Actions in relation to issues in controversy regarding any Intellectual Property rights of Party B or any of its Customers, this Contract's applicable provisions thereto shall subject to interpretation and interpretation in accordance with the laws of, United States of America. Any dispute or Action arising out of any question regarding the formation, performance, breach, termination, validity of any provision in connection with such Intellectual Property rights of this Agreement, shall be firstly resolved by friendly negotiation by the Parties in good faith. In case either party is unwilling to settle the dispute through

> negotiation or if both Parties fail to reach any agreement within (30) days after the negotiation begins, either Party may submit such dispute to the competent court for a settlement. All matters arising out of or relating to such disputed Intellectual Property rights contemplated by this Contract, are governed by, and construed in accordance with, the Laws of the State of New York, United States of America, without regard to the conflict of laws provision thereof. Each Party irrevocably and unconditionally agrees that it shall not commence any Action relative to disputed Intellectual Property rights of any kind whatsoever against the other Party in any way arising from or relating to this Contract, including all exhibits, schedules, attachments and appendices attached hereto and thereto, and all contemplated transactions, including contract, equity, tort, fraud, and statutory claims, in any forum other than the United States, District Court for the Southern District of New York or, if such court does not have subject-matter jurisdiction, the courts of the State of New York sitting in New York County, and any appellate court from any thereof. Each Party agrees that a final judgment in any Action involving disputed Intellectual Property is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

*See Knight v. N.Y. & Presbyterian Hops.*, 252 N.E.3d 496, 498 (N.Y. 2024) (iterating the Court of Appeals' position that forum selection clauses have long been recognized as valid and enforceable on their face).

24. Under Section 3.1.23 of the Contract,

> "Intellectual Property" means all intellectual property rights that was developed and/or owned by either Party prior to and independently of its arrangements with the other Party under this Contract throughout the word, including all Malaysia, the USA and other foreign (i) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, provisionals, renewals, reissues, re-examinations, additions, extensions (including all supplementary protection certificates) ("Patent Rights"), (ii) trademarks, service marks, names, corporate names, trade names, domain names, logos, slogans, trade dress, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (iii) copyrights and copyrightable subject matter ("Copyrights"), (iv) rights in computer programs (whether in source code, object code, or other form), algorithms, databases, compilations and data, technology supporting the foregoing, and all documentations, including user manuals and training materials, related to any of the foregoing, (v) trade secrets and all other Confidential Information, ideas, know-how, inventions, proprietary processes, formulae, models, and methodologies, and (vi) all applications and registrations for the foregoing

25. Under Section 3.1.30 of the Contract, "Party B's Intellectual Property" or "Party B's Property" is defined as

> …any rights to Intellectual Property that was owned by Party B prior and independently of its dealings with Party A under this Contract; and includes Party B's Packaging Material and all data, writings and other property in any form whatsoever, which is provided to Party A by or on behalf of Party B, and which was owned or controlled by Party B and/or its respective Affiliates pursuant to this Contract or any other Ancillary Agreement prior to being provided to or used by Party A hereunder.

26. The Contract clearly contains an explicit carveout in Section 8.3 for any dispute or action involving intellectual property claims such as "any question regarding the formation, performance, breach, termination, validity of any provision in connection with such Intellectual Property rights of this Agreement."

27. In fact, the Contract specifies that the Parties "irrevocably and unconditionally" agree to limit the venue for any such disputes or actions to be brought before this Honorable Court.

28. Nothing in the Contract suggests that any such dispute or action needs to be based in intellectual property law for this Section 8.3 to apply.

29. Rather, Section 8.3 is drafted extremely broadly and repeatedly references that Section 8.3 is an exception to the rest of Article 8.

30. Upon information and belief, Defendant was the sole drafter the Contract and the Second Amendment.

31. Plaintiff did not participate in, nor was Plaintiff given the opportunity to participate in, the drafting of the Contract and the Second Amendment.

32. Plaintiff was not represented by counsel with respect to the Contract or the Second Amendment.

33. Article 8 of the Contract could reasonably be considered ambiguous, in which case it should be interpreted in Plaintiff's favor.

34. Venue is also proper in this district under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(c)(2) since, upon information and belief, Defendant resides in New York as it maintains its principal place of business in New Rochelle, New York.

## III. PARTIES AND KEY INDIVIDUALS

35. Plaintiff realleges and incorporates by reference each and every allegation contained in the previous paragraphs as if set forth fully herein.

36. Plaintiff is a private limited company formed under the laws of the Country of Malaysia, with its principal place of business in Selangor, Malaysia. Plaintiff is in the business of repacking and exporting medical gloves from Malaysia to the United States of America.

37. MNA Dynamic Enterprise ("MNA Asia") is a private limited company formed under the laws of the Country of Malaysia and is in the business of repackaging and exporting medical gloves from Malaysia to other Asian countries.

38. Mohd Nazrul Abdullah ("Abdullah") is the sole owner and managing director of Plaintiff and MNA Asia.

39. Defendant is a limited liability company formed under the laws of the State of New York, and, upon information and belief, Defendant does business in New Rochelle, New York. Upon information and belief, with its principal place of business in the State of New York, County of Westchester.

40. Upon information and belief, London Luxury Health Private LTD ("LLH") is a Singapore private limited company which acts as a satellite office for Defendant and assists Defendant with doing business in Asia.

41. Upon information and belief, Mathilda Laas *aka* Freda ("Laas") is a director of LLH and a representative of Defendant.

42. Upon information and belief, Marc Jason ("Jason") is the sole member and Chief Executive Officer (CEO) of Defendant.

43. Upon information and belief, Gordon Lewis ("Lewis") is the Chief Financial Officer (CFO) of Defendant.

44. Upon information and belief, Moshe Abehsera ("Abehsera") is the Chief Commercial Officer (CCO) of Defendant.

45. Walmart Inc. ("Walmart") is a prominent, omnichannel retailer with a presence in the United States and internationally.

46. Ansell Limited ("Ansell") is an Australian manufacturing company which, at all material times, made different personal protection equipment, such as latex, rubber, and nitrile gloves.

47. Careplus Group Berhad, known as Careplus, is a private limited company formed under the laws of the Country of Malaysia with multiple subsidiary companies, including Careplus (M) SDN BHD and Careglove Global SDN BHD, (collectively "Careplus"), and Careplus, at all material times, was a manufacturer of rubber, latex, and nitrile gloves.

48. Careglove Global SDN BHD ("Careglove") is a subsidiary company of Careplus which manufactures nitrile gloves.

## IV. COMMON FACTUAL ALLEGATIONS

49. Plaintiff realleges and incorporates by reference each and every allegation contained in the previous paragraphs as if set forth fully herein.

50. In this action, Plaintiff seeks to recover damages in an amount to be determined as fair and just under the circumstances and of no less than Five Hundred Million United States Dollars ($500,000,000.00 USD) by virtue of breach of contract by, fraud by, and unjust enrichment of Defendant.

51. On April 7, 2021, the Parties executed the Contract, under which Plaintiff was responsible for repackaging powder free, latex free, disposable, non-sterile, Grade A – FDA, 5-1K and CE certified, one hundred percent (100%) nitrile medical examination gloves (the "Gloves", each a "Glove") into boxes bearing Defendant's "Dr. Smart" branding (the "Dr. Smart Boxes") and for exporting the repackaged gloves from Port Klang, Selangor, Malaysia to the Port of Los Angeles, United States of America, unless otherwise instructed by Defendant in writing.

52. On August 26, 2021, the Parties executed the Second Amendment.

53. Plaintiff has faithfully and fully complied with all its obligations under the terms of the Contract and the Second Amendment and has been and remains ready, willing, and able to perform and satisfy any of its obligations under the Contract which were not performed due to Defendant's breach of said Contract. Defendant, however, has failed to perform or otherwise satisfy its obligations to Plaintiff under the Contract and the Second Amendment and has prevented Plaintiff from fully performing its obligations under the Contract and the Second Amendment.

**A. PLAINTIFF'S INITIAL DEALINGS WITH DEFENDANT**

54. Upon information and belief, following the beginning of the Covid-19 pandemic, MNA Asia was sought after by many companies across Asia to supply and export medical gloves due to the increased demand for medical and protective equipment at the time. MNA Asia was working with businesses in multiple Asian countries including South Korea and Singapore.

55. In the course of conducting MNA Asia's business, Abdullah became acquainted with Maharishi Yogesh Sharma ("Sharma"), a senior private banker at Deutsche Bank. In early 2021, Sharma approached Abdullah and advised that Laas, whom, upon information and belief, Sharma knew well, was seeking a nitrile gloves supplier and exporter.

56. Shortly thereafter, in or around February 2021, Sharma introduced Abdullah to Laas, through whom Plaintiff and Defendant later came into contact with one another.

57. Upon information and belief, on February 23, 2021, Walmart Inc. made a written commitment to Defendant to purchase a minimum of six million seventy-two thousand seven hundred seventy (6,072,770) master cartons of powder-free nitrile examination gloves over the span of twelve (12) months.

58. Upon information and belief, Walmart's written commitment was made contingent upon the product satisfying industry and regulatory standards and SGS Société Générale de Surveillance SA ("SGS") standards.

59. Upon information and belief, prior to or around the time that Walmart made the aforementioned purchase commitments, Defendant tasked Laas with finding a supplier for nitrile gloves after which she approached Sharma who introduced her to Abdullah and Plaintiff.

60. When Abdullah and Laas first spoke, Laas inquired whether Abdullah could satisfy Defendant's supply needs for nitrile gloves and mentioned the approximately six million (6,000,000) boxes that Defendant was seeking over the course of the next year and thereafter.

61. Abdullah advised Laas that, through Plaintiff, he could satisfy Defendant's supply needs, but that Plaintiff would require a payment guarantee of sorts before moving forward.

62. Abdullah made Laas aware that Plaintiff would need to set up a dedicated facility specifically to accommodate Defendant's repackaging due to the significant amount of cargo that Defendant needed Plaintiff to repackage, store, and export.

63. Upon information and belief, prior to the Parties entering into the Contract, Laas clearly told Abdullah that she would be Plaintiff's primary point of contact and that Plaintiff should communicate with her directly to avoid any miscommunication between the Parties.

64. In or around March 2021, Laas arranged for Abdullah to have a Zoom call with Jason, Lewis, and Abehsera, to further discuss whether Plaintiff could fulfill the nitrile glove needs of Defendant and what the logistics of that arrangement would entail.

65. On March 29, 2021, Abdullah officially incorporated Plaintiff for North American operations and transactions.

66. Abdullah chose to open a separate entity from MNA Asia to manage the risk of entering a new market.

67. Thereafter, Plaintiff and Defendant continued discussions and negotiations regarding a potential working arrangement between the Parties.

68. During their negotiations, the Parties agreed, in no uncertain terms, that Defendant was responsible for advancing all payments to Plaintiff since Plaintiff would be remitting payment to the manufacturer of the Gloves on Defendant's behalf for logistical efficiency; this was a material part of the Parties' agreement.

69. Further, at no point during negotiations did Defendant request that Plaintiff obtain or indicate that it felt Plaintiff would be responsible for obtaining the intellectual property rights associated with the particular brand of gloves it sought to have repackaged and exported.

70. Nor did Defendant ever indicate to Plaintiff that Defendant did not have the intellectual property rights to repackage or have repackaged and resell the particular brand of gloves it wished to have Plaintiff repackage and export.

71. Following the negotiations between the Parties, Defendant proposed the Contract to Plaintiff.

**B. THE SALES PURCHASE AGREEMENT DATED APRIL 7, 2021**

72. It was Plaintiff's understanding that the material terms discussed by the Parties were reflected in the Contract when Defendant proposed it, including the agreement between the Parties that Defendant would make advanced payments to Plaintiff for all shipments.

73. On April 7, 2021, the Parties entered into the Contract.

74. Plaintiff was not represented by legal counsel with respect to the Contract nor did Defendant at any time suggest to, advise, or otherwise encourage Plaintiff to retain counsel.

75. Plaintiff's primary obligations under the Contract were to repackage certain amounts of Gloves in Dr. Smart Boxes, to package those boxes into cartons, to pack those cartons into containers, and then to export those containers to Defendant's designated point of delivery in the United States.

76. Defendant's primary obligations under the Contract were to arrange for Plaintiff to obtain or to approve Plaintiff to source Gloves of a certain brand for repackaging and to pay Plaintiff for the services it rendered.

77. Under Article 1 of the Contract in "Party B – Buyer Details", Defendant identified its key representatives and officials as follows: Laas, a director of LLH, Jason, the CEO of Defendant, and Lewis, CFO of Defendant, all three of whom had the apparent, if not actual, authority to represent and bind Defendant as Defendant's agents.

78. Further, the Contract specifically includes the following key terms:

<table>
<tr><td rowspan="5">Item 1 – Commodity Details</td><td>Description</td><td>Nitrile Medical Examination Gloves under Ansell® Micro Touch brand name only. No substitutions without Buyer written approval.</td></tr>
<tr><td>Material</td><td>Manufactured from 100% Nitrile (Acrylonitrite Butadiene), Latex free.</td></tr>
<tr><td>Features</td><td>Blue Color, Powder Free, Latex free. Disposable and Non-sterile. Use with both hands, wrists will be contoured, smooth glove surface or rough palm areas; textured fingertips; examination gloves.</td></tr>
<tr><td>Origin</td><td>Malaysia</td></tr>
<tr><td>Quality</td><td>EN 455, EN 374, ASTM D6319 and D6978, Grade A – FDA, 501K and CE certified. Commodity to be 100% new, completely free of dust, dirt and other debris. Second quality strictly prohibited.</td></tr>
<tr><td>Item 2 (a) – Price per Unit Basis<br><br>Item 2 (b) – Initial Costs</td><td colspan="2">$20.55 FOB per box of 300 gloves negotiable for a contract of 5 years.<br><br>Repacked for shipping: 100 pieces per box and 25 boxes per carton consisting of Ansell Micro Touch branded outer carton boxes. ONLY CARTONS OF ANSELL MICRO TOUCH WILL BE USED THAT IS SUPPLIED TO SELLER FOR THE QUANTITY OF THE GLOVES ORDERED.<br><br>Price includes redesigned boxes of buyer, repackaging of the gloves FOB Malaysia port.<br><br>Payments (two equal installments of $850,000) to be transferred to London Luxury Health PTE Ltd. of which the first installment is to be made within 5 business Days of signing this contract. Second installment will be sent to London Luxury Health PTE Ltd. after delivery of the second shipment of stock. Such funds to be disbursed to Seller within 5 business days upon receipt of invoices issued to Seller for the costs following final design and printing of boxes. First payment will be deducted on week 4 invoice and second will be deducted week 8 invoice. Such funds may only be used for the design and printing of 6 million Dr. Smart boxes, the lease agreement of the warehouse at port, the initial expenses of hiring of staff for the repackaging of Buyer's products.</td></tr>
</table>

| | |
|---|---|
| Item 3 – Contract Quantity | 2,000,000 boxes (300 gloves per box) per month for a twelve month contract (commencing on first Shipment) with rollover to 5 years subject to termination and other provisions of this Agreement. (Repacked: 6,000,000 boxes per month. 100 gloves per box. 25 boxes per carton (Ansell) with a minimum shipment of 1,500,000 boxes per week (100 gloves per box). |
| Item 4 – Contract's Gross Value | $493,200,000.00 per annum |
| Item 5 – Packing Requirements | In Ansell Micro Touch external boxes which allows for 25x100 (glove boxes) per carton. |
| Item 6 – Delivery Point | Factory shall deliver goods to Warehouse at Port Klang whereafter MNA Gloves will repack for collection by buyer's Freight Forwarders. |
| Item 7 – Delivery Schedule Units | Delivery date for the first batch: after friendly consultations between both parties, the delivery arrangement shall be arranged as follows: the delivery date for the batch shall be 28 days or sooner after the Buyer has issued a letter of credit to the Seller. |
| Item 8 – Loading Point | Malaysia ("Port Klang, Selangor") as instructed by Buyer on a delivery-by-delivery basis. |
| Item 9 – Final Destination | United States of America ("USA") /Port of Los Angeles unless otherwise instructed by Buyer in writing. |
| Item 10 – Delivery Documents | As described in Article 5, and as a requirement for receiving payment on deliveries undertaken under this Contract, it is the responsibility of Seller to provide Buyer with all of the following Delivery Documents to be issued by Ansell in the name of Buyer prior to any payment, specifically, the following:<br><br>A. SGS Inspection and testing reports marked "PASSED" at departing port/airport at buyer's cost.<br>B. Commercial Invoice.<br>C. Packing List.<br>D. Certificate of Origin.<br>E. Certification of Conformity to Quality Standards.<br>F. Copy of certificates issued by relevant authorities in support of Commodity's conformity to Quality Standards including copy of 510k Certificate as per as per [sic] Ansell Factory registration of Ansell Micro Touch. Bill of Lading (Air Way Bill if by air freight) to be provided by Buyer or Shipping Company. |

| | |
|---|---|
| Item 11 – Delivery Terms | Initial delivery of Commodity shall be delivered to Buyer's appointed Shipping Company as scheduled. The Seller shall send a shipping notice 7 business days to the Buyer before delivery. |
| Item 12 – Payment Terms | After the Contract has been executed by both parties, the Buyer shall open an irrevocable transferable L/C at sight within 15 business days for the amount of $41,100,000.00 (Forty one Million, one hundred thousand United States Dollars). No drawdown on LC provided that TT Payment is made within maximum 5 business days after Buyer receives accurate Delivery Documents set forth in Item 10 and Buyer receives "PASSED" SGS report for products and documents as per item 10 above delivered to buyer. The Seller shall charge a 0.05% fine on the total amount of the Contract for each 7 day delay in opening the LC beyond the 15 business days. If the delay in opening the LC continues for more than 45 business days, the Buyer shall pay a 2% fine on the total amount of the goods.<br><br>Seller bears all risk of loss or damage to the goods until delivery of the goods to the shipping location. |

Ex. 2 at 2–3.

79. The aforementioned key terms and the remainder of the Contract were ambiguous as to who was responsible for actually procuring the Gloves which were to be repackaged by Plaintiff under the Contract.

80. Plaintiff's obligations under the Contract, relating to sourcing the Gloves, were merely to remit payment to the manufacturer for the Gloves as they were ordered and to assist Defendant, or its customers, in working with the manufacturer, such as obtaining permission from the manufacturer of Ansell gloves for audits and/or for inspection of their facilities as contemplated in Section 5.6 of the Contract.

81. In addition to the above-quoted and referenced provisions, under Article 6 of the Contract the Parties had the following obligations:

6.1 Obligations of Buyer:
6.1.1 To issue LC as agreed.
6.1.2 Issue timely any PO and any related invoices in full as agreed.

6.1.3 Preparing facilities to take delivery at Delivery Point, Loading Point and Final Destination.
6.1.4 Other obligations stated in this Contract.

6.2 Obligations of Seller
6.2.1 Provide Commodity to the Buyer in the right quantities, quality, models, standards of goods in accordance with this Agreement and the certificates that the Seller has provided to the Buyer, including SGS report, CE, FDA, ISO, EN 455, 510K as well as time and place agreed in this contract. Factory 510k certificate to be provided to Buyer upon execution of this Agreement. Seller shall meet or exceed Buyer's quality standards for the goods as set forth in this Agreement and as communicated to Seller from time to time in writing. Seller shall perform testing protocols including SGS testing, quality inspections of goods before delivery and shall provide the buyer with a copy of the testing report. All costs relating to SGS reports are for the Buyer.

6.2.2 Seller shall at all times comply with all laws applicable to this Agreement. Seller's operation of its business and the exercise of its rights and performance of its obligations hereunder. Without limitation of the foregoing, Seller shall ensure the Commodity and any related packaging, conform fully to any applicable law in the United States. Upon Buyer's request, Seller shall provide Buyer with (a) written certification of Seller's compliance with applicable laws; (b) written certification of the origin of any materials in the goods; and (c) any additional information regarding the goods requested by Seller such that Seller may comply in a timely manner with its obligations under existing contracts and law. Seller shall coordinate with the Buyer to solve problems arising during the contract performance and delivery of the Commodity.
6.2.3 Other obligations stated in this Contract.

Ex. 2 at 8.

82. The operative additions in Article 6 of the Contract are as follows, in simpler terms:

a. Defendant was responsible for issuing timely purchase orders to Plaintiff,

b. Defendant was also responsible for ensuring that once shipments of the Gloves were delivered, the receiving facilities would be prepared to take delivery.

c. Defendant was also responsible for all costs associated with SGS reports.

d. Plaintiff was responsible for ensuring that shipments of Gloves were compliant with United States laws.

e. Plaintiff was responsible for providing, at Defendant's request:

i. written certification of Plaintiff's compliance with all applicable laws;

ii. written certification of the origin of any materials used in the Gloves; and

iii. any other information requested to verify legal compliance.

f. Plaintiff was responsible for "coordinat[ing] with" Defendant "to solve problems arising during the contract performance and delivery" of the shipments of Gloves.

83. Nowhere in the Contract is it specified that Plaintiff is responsible for obtaining intellectual property rights for Defendant to have repackaged or to resell the "Nitrile Medical Examination Gloves under Ansell® Micro Touch brand name", nor does the Contract specify that Plaintiff is responsible for arranging for the manufacturer from which the specific Gloves Defendant sought were to be sourced. Ex. 2 at 2.

84. Further, in the event of any issue between the Parties, under Section 7.2 of the Contract, "[a]ny violation of rights and obligations specified in this Contract shall be deemed a breach of contract **provided that the violated Party has given a notice hereof and violating Party still fails to remedy its actual or alleged infringements within twenty (20) Days from the receipt of such notic**e" (emphasis added). Ex. 2 at 10.

85. Notwithstanding the foregoing clause, under Section 7.6 of the Contract, "[d]uring the Contract Term, either Party fails to perform its obligations as provided in Article 6, the non-breaching Party reserves the right to terminate this Contract without prejudice to other rights or remedies that it may have in equity and at law." *Id.*

86. In the event of breach, the Contract also provides, in Section 5.1.5, that

> In the event that due to causes attributable to Buyer, the Seller is unable to make delivery or Buyer is unable to accept delivery of the Commodity at the Delivery Point or Loading the following penalty shall bestow upon the defaulting party:
> **Claim:**

> If the Buyer has any objection to the goods or makes a claim, within sixty (60) days of delivery to the end customer. Non-compliance report with respect to the Quality Standards issued by SBS shall be provided. All documents leaving the factory shall be in the name of the end buyer.
> **Penalty:**
> If the Seller fails to deliver the goods as scheduled and the delay exceeds 7 Days, the Seller shall pay the liquidated damages to the buyer. The Seller shall be charged a penalty of 0.50% of the goods shipped for every 7 days of delay. If the delay continued for 45 or more days, the Buyer shall have the right to cancel the Contract and require the Seller to pay a fine for delay in delivery. The amount of the fine shall be equal to 2% of the total contract value.

Ex. 2 at 7.

87. As is clear from the above-quoted excerpts of the Contract, Defendant drafted the Contract completely to be one-sided, entirely in its favor.

88. The above-referenced provision attempts to impose a penalty upon Plaintiff; however, it provides no similar clause if Defendant fails to satisfy its material obligations to Plaintiff under the Contract.

89. Further, throughout the Contract, it is clear, from the numerous ambiguities, conflicting terms, and lack of inclusion of the material terms the Parties agreed upon orally, that Defendant was wholly careless in drafting the Contract and was more interested in serving its own interests than honoring and memorializing the material terms upon which the Parties agreed during their negotiations.

### C. PLAINTIFF'S EFFORTS TO ASSIST DEFENDANT WITH SOURCING THE GLOVES & STORAGE OF DR. SMART BOXES

90. As a gesture of good faith and for logistical efficiency, though Plaintiff was not contractually obligated to do so, Plaintiff agreed to assist Defendant with identifying a manufacturer from which to source the Gloves.

91. However, Defendant was ultimately responsible for identifying the manufacturer of the Gloves in connection with the Contract.

92. Immediately after entering into the Contract, Plaintiff diligently attempted to work with Defendant to procure Ansell ® MicroTouch brand nitrile gloves ("Ansell Gloves") which are manufactured by Ansell so that Plaintiff could perform under the Contract, even though Plaintiff was not contractually obligated to assist with arranging for the Ansell Gloves.

93. Upon information and belief, Ansell exclusively owns all of the intellectual property associated with the Gloves, and Ansell has registered, maintains, and has maintained at all material times multiple types of intellectual property associated with the Gloves and the Ansell brand in the United States.

94. Upon information and belief, Ansell maintains and has maintained at all material times at least one (1) trademark registered with the United States Patent and Trademark Office (USPTO) with respect to the Ansell brand.

95. Upon information and belief, Ansell maintains and has maintained at all material times at least one (1) patent registered with the USPTO with respect to the composition of Ansell's nitrile gloves.

96. Under the Contract, the only brand of glove which Defendant authorized Plaintiff to repackage and export, without Defendant's written approval otherwise, is Ansell Gloves.

97. However, upon information and belief, Defendant never obtained approval, a license, or otherwise permission from Ansell to use, repackage, or resell Ansell Gloves and the intellectual property associated therewith at any material time.

98. Plaintiff attempted to leverage its own business connections through MNA Asia with a manufacturer called Top Gloves which Plaintiff knows to produce Ansell Gloves; however, at the time, the United States had placed an import ban of Top Gloves due to unlawful labor practices.

99. Plaintiff was unable to find any other Malaysian manufacturer from whom Ansell Gloves could be sourced either.

100. Upon information and belief, on or about May 27, 2021, a representative from Ansell, the manufacturer of Ansell Gloves, advised both Defendant and Walmart that Ansell did not supply nitrile gloves to other companies for repackaging nor did it allow other companies to put their branding on and resell Ansell Gloves.

101. At no time prior to Plaintiff receiving notice about the aforementioned communication from Ansell did Plaintiff believe or have any reason to believe that Defendant did not have the requisite intellectual property rights from Ansell to have Plaintiff repackage Ansell Gloves into Dr. Smart Boxes.

102. Despite Defendant's difficulties in identifying a manufacturer, Plaintiff moved forward with entering into a lease agreement on or about May 19, 2021 to ensure that Plaintiff would have space to store the Gloves and associated boxes in which they needed to be repackaged.

103. But for the Contract, Plaintiff would never have entered into the aforementioned lease agreement.

104. On or about May 19, 2021, Plaintiff entered into a two (2) year lease agreement with a monthly rate of approximately Eighteen Thousand United States Dollars ($18,000.00 USD).

105. Plaintiff made an approximately Seventy-One Thousand United States Dollar ($71,000.00 USD) deposit for the space as well.

106. Plaintiff was later unable to fulfill its lease obligations and lost its entire deposit in or around August • when the lease was prematurely terminated following Defendant's wrongful conduct.

107. The Parties orally agreed that Defendant would reimburse the cost of the warehouse to Plaintiff since the location was exclusively for storage and repackaging of Gloves in connection with the Contract.

108. Section 2(b) of the Contract affirmed the Parties' agreement and referenced Defendant advancing payments to Plaintiff in connection with the expenses for the "lease agreement of the warehouse". Ex. 2 at 2.

109. In or around May 2021, despite Defendant not yet having sourced, let alone ordered, any Gloves, Laas made arrangements with a printing company in Malaysia to print one million five hundred thousand (1,500,000) Dr. Smart Boxes.

110. By late May 2021, Plaintiff had a warehouse full of boxes but no Gloves to repackage and export for Defendant, nor had Defendant authorized Plaintiff to attempt to source Gloves from another manufacturer, thus rendering Plaintiff's performance impracticable at the time since neither did Defendant, nor Plaintiff nor Walmart at any time have the intellectual property rights or license to use, repackage, and/or resell Ansell Gloves.

111. On June 15, 2021 at 1:11 PM MYT, Laas advised Abdullah in a WhatsApp message that "any ready stock of Careplus or Ansell is ok" since Walmart was "preparing to cancel" their purchase order with Defendant.

112. Accordingly, in continued good faith, Plaintiff pivoted to obtaining nitrile gloves manufactured by Careglove per Laas's direction since she was designated in the Contract as a representative of Defendant.

113. In or around May or June 2021, Plaintiff was able to successfully aid Defendant in sourcing Gloves made by Careglove.

114. In sum, in or about July 2021, Defendant, Walmart, and Plaintiff were all keenly and unquestionably aware that

a. neither Party was able to secure Ansell gloves, gloves manufactured by Ansell, or gloves manufactured in an Ansell facility otherwise, and

b. neither Walmart, Defendant, nor Plaintiff had the intellectual property or any other right or license to repackage Ansell gloves under Defendant's Dr. Smart branding or any other brand name.

**D. THE TEST SHIPMENT OF GLOVES**

115. In June 2021, Defendant asked Plaintiff to obtain and repackage Gloves manufactured by Careglove into four hundred fifty-five thousand (455,000) Dr. Smart Boxes, prepare them in shipment containers, and export them to Walmart in Long Beach, California within two (2) weeks.

116. It was Plaintiff's understanding at all material times that the aforementioned order would not count against the Contract value nor the minimum order requirements in the Contract; Defendant framed this shipment as a test-run prior to the shipments of Gloves Plaintiff was to make under the Contract. Accordingly, at this point, Defendant had not yet placed or accepted a single shipment under the Contract.

117. On June 29, 2021, Plaintiff issued invoice M0752 in the amount of Three Million Seventy-One Thousand Two Hundred Fifty United States Dollars ($3,071,250.00 USD) for the test shipment of the Gloves.

118. Defendant remitted to Plaintiff the payment due for the Test Shipment, through Laas and LLH consistent with the payment terms under the Contract.

119. Defendant paid Plaintiff for the Test Shipment based upon the pricing in the Contract.

120. All payments Defendant made to Plaintiff were remitted through Laas and LLH.

121. After Plaintiff agreed, Defendant booked thirteen (13) shipping containers for Plaintiff to export the Gloves.

122. In or around July 2021, within the two (2) week timespan, Plaintiff received and stored the aforementioned four hundred fifty-five thousand (455,000) Gloves manufactured by Careglove in its warehouse, repackaged the aforementioned Gloves into Dr. Smart Boxes, prepared thirteen (13) containers filled with the aforementioned Gloves, then exported the aforementioned containers to the United States for Defendant (the "Test Shipment").

123. The Test Shipment was successfully shipped in accordance with the parameters of and requirements in the Contract, though it was not part of the minimum volume of Gloves to be repackaged under the Contract.

124. In or around August 2021, the Test Shipment was delivered to Walmart, who upon information and belief, expressed appreciation to Defendant for the Test Shipment.

125. On August 17, 2025 at 3:12 AM MYT, Abdullah sent Laas a WhatsApp message to confirm Plaintiff's understanding that the Test Shipment did not count towards the total order volume contemplated in the Contract.

126. On August 17, 2025 at 3:13 AM MYT, Laas confirmed to Abdullah in a WhatsApp message that Plaintiff's understanding was correct and that no shipment had been made or received under the Contract at this point.

127. Also on August 17, 2025, Laas sent additional messages to Abdullah advising him that Defendant would try to convince Plaintiff to amend the existing LC, and she urged Abdullah that Plaintiff should not agree to any changes that are inconsistent with the Contract.

128. Laas did not, however, mention that Defendant would later wish to amend the Contract between the Parties.

**E. THE SECOND AMENDMENT DATED AUGUST 26, 2021**

129. In August 2021, after Plaintiff accommodated the Test Shipment as a gesture of good faith, Defendant fraudulently induced Plaintiff's signature on the Second Amendment.

130. Upon information and belief, although Walmart was pleased with the Test Shipment, following the Test Shipment Defendant approached Plaintiff to reduce the order minimum for which it was responsible under the Contract.

131. Upon information and belief, in 2021, Defendant conspired with Garrett Small ("Small"), a Walmart employee from 2005 to March 2022, to fabricate a letter agreement between Walmart and Defendant dated June 14, 2021 in which Walmart expanded its purchase commitment to Defendant over the span of five (5) years since Defendant was launching glove manufacturing operations in the United States.

132. Upon information and belief, Small was not authorized by Walmart to enter into any such letter agreement with Defendant nor was Walmart aware that Defendant had any plans to open a manufacturing facility in the United States.

133. Defendant's knowledge of its plans to open a manufacturing facility in the United States and about the increased purchase commitment from Walmart, regardless of whether any such commitment was genuine, were superior to Plaintiff's lack of knowledge thereof, and Plaintiff

could not reasonably have known, learned, or discovered Defendant's plans or new arrangements with Walmart on its own.

134. Upon information and belief, Defendant intended to induce Plaintiff to enter into the Second Amendment so that Defendant's financial obligations would be lowered and to make it easier for Defendant to get out of its contractual agreement with Plaintiff with the added requirements for audit compliance.

135. At no material time before or while Plaintiff executed the Second Amendment did Defendant inform Plaintiff about any increased order volume or commitment from Walmart, albeit fraudulent, nor about Defendant's plans to establish manufacturing operations in the United States.

136. At this point, Plaintiff had incurred significant extra costs associated with its performance under the Contract since Defendant failed to perform and had not satisfied its financial obligations to Plaintiff, and Plaintiff was concerned about being able to continue operations, pay its workers, and fulfill its rent obligations to the facility's landlord.

137. Defendant had a duty to disclose the increased purchase commitment and its plan to engage in a business which would effectively compete with Plaintiff's business prior to tricking Plaintiff into signing the Second Amendment.

138. Unfortunately, Defendant failed to satisfy its duties to Plaintiff and intentionally omitted the aforementioned material facts which Plaintiff could never have known or discovered absent disclosure from Defendant.

139. On August 26, 2021, after Defendant proposed the Second Amendment to Plaintiff, the Parties entered into the agreement.

140. Upon information and belief, Defendant led Plaintiff to believe that it did not have an option but to enter into the Second Amendment.

141. Upon information and belief, Defendant presented the Second Amendment as a requirement to continue the Parties' working arrangement, despite Defendant's preexisting contractual obligations under the Contract.

142. Plaintiff was not represented by counsel with respect to either the Contract or the Second Amendment, and Abdullah's first language is not English.

143. Upon information and belief, Defendant was aware that Plaintiff and its primary representative were not sophisticated contracting parties to the extent that it relates to contractual agreements.

144. Plaintiff was concerned about keeping its business afloat and was concerned about Defendant reneging on the Contract prior to entering into the Second Amendment.

145. Upon information and belief, but for Defendant's undue influence, misrepresentations, and material omissions, Plaintiff had no reason or incentive to enter into the Second Amendment since, if it were deemed enforceable, it would relieve Defendant of significant obligations to Plaintiff under the Contract without any consideration whatsoever to Plaintiff.

146. Both the Contract and Second Amendment were wholly one-sided agreements.

147. Plaintiff would never have entered into the Second Amendment if it knew about the increased commitments from Walmart to purchase gloves.

148. Also, if Plaintiff knew that Defendant was planning to set up a manufacturing plant in the United States which would effectively compete with the services Plaintiff was to provide Defendant under the Contract and that Defendant was attempting to usurp its corporate opportunities under the Contract, then Plaintiff would also have not entered into the Second Amendment.

149. Plaintiff's signature on the Second Amendment was solely in reliance on the representations and omissions made by Defendant.

150. The Second Amendment included the following key amendments to the Contract:

| | |
|---|---|
| Item 2 – Price per Unit Basis | $6.50 per box of 100 gloves.<br><br>Packed for shipping: 100 pieces per box and 10 boxes per carton.<br><br>Price includes redesigned boxes of buyer, repackaging of the gloves FOB Malaysia port.<br><br>Customer of L/C number DC HKH978800, customer or customer's bank will reissue the L/C for every 60 days until exhaustion of the quantity of 70,000,000 pieces per month of Product for the 12 month period of the Agreement. |

| | |
|---|---|
| Item 3 – Contract Quantity | 700,000 boxes per month for a twelve month contract (commending on first Shipment). |
| Item 4 – Contract's Value | $54,600,000.00 per annum |

Ex. 3 at 1.

151. Further, in Section 2 of the Second Amendment, "Section 4.2 is amended to reflect that the total value of L/C is $9,100,000, consistent with the amendment to Item 12, above." Ex. 3 at 2.

152. In Section 3 of the Second Amendment, another new requirement was imposed on Plaintiff:

> MNA must adhere to all London Luxury's customers compliance, audit and social audit requirements – this includes shipping on time all that has been committed to, to be packed, properly labeled, loaded into containers, (providing all packing lists matching to all goods packed) on an ongoing and continuous basis. This also includes proper onsite inspections, and

accounting of all goods. Any noncompliance, will place MNA in default of the agreement, and render the agreement and void.

*Id.*

153. In summary, under the Second Amendment,

a. the total contract value was reduced to Fifty-Four Million Six Hundred Thousand United States Dollars ($54,600,000.00 USD), approximately eleven percent (11%) of the Contract's value;

b. the monthly order volume was decreased to seven hundred thousand (700,000) boxes, approximately twelve percent (12%) of the Contract's volume;

c. the price per box of one hundred repackaged nitrile gloves was reduced to Six United States Dollars and Fifty Cents ($6.50 USD), a Thirty-Five Cent (35₵) decrease from the price under the Contract;

d. the term of the contract was reduced to a twelve (12) month period from a twelve (12) month period with rollover to an additional five (5) year term;

e. the LC requirement was reduced to Nine Million One Hundred Thousand United States Dollars ($9,100,00.00 USD); and

f. Plaintiff was required to comply with additional compliance, audit, and social audit requirements or Plaintiff would be in default and the agreement would, by its terms, be rendered null and void.

154. While the Contract was already extremely one-sided and completely in Defendant's favor, Defendant managed to further trap Plaintiff in a subsequent agreement which further reduced the benefit of the bargain to which Plaintiff was entitled under the Contract and imposed additional, burdensome obligations on Plaintiff.

155. Further, Defendant did not provide Plaintiff with any additional consideration for the Second Amendment, nor was there any commercially reasonable purpose or explanation for the Second Amendment.

156. Upon information and belief, Plaintiff never had the opportunity to negotiate the Second Amendment, nor was it receiving any new consideration or anything under the Second Amendment to which it was not already entitled under the Contract.

157. The only effect of the Second Amendment was Plaintiff effectively foregoing its rights under the Contract and assuming additional obligations, while Defendant reduced the consideration, for which Plaintiff bargained, otherwise owed to Plaintiff under the Contract.

158. The Second Amendment is not an enforceable agreement between the Parties; rather it is a sham attempt by Defendant to mitigate its potential exposure for breach of its obligations and responsibilities towards Plaintiff under the Contract.

159. Despite the reduced obligations for Defendant under the Second Amendment, Defendant continued to fail in satisfying its obligations to Plaintiff under the Second Amendment and continued preventing Plaintiff from performing under the Second Amendment despite Plaintiff remaining ready, willing, and able to perform under both the Contract and the Second Amendment at all material times.

**F. LETTERS OF CREDIT**

160. Under the Contract and the Second Amendment, Defendant was responsible for obtaining an LC in the amount of Forty-One Million One Hundred Thousand United States Dollars ($41,100,000.00 USD) and Nine Million One Hundred Thousand United States Dollars ($9,100,000.00 USD) respectively.

161. On or about April 27, 2021, Defendant obtained an LC from Hongkong and Shanghai Banking Corporation Limited serviced through HSBC Bank USA NA (collectively "HSBC") in the amount of Eighty-Two Million Two Hundred Thousand United States Dollars ($82,200,000.00 USD) pursuant to the Contract.

162. Upon information and belief, the LC dated April 27, 2021 was later rescinded or cancelled by Defendant following the execution of the Second Amendment.

163. On September 3, 2021, Defendant obtained an LC from HSBC in the amount of Nine Million One Hundred Thousand United States Dollars ($9,100,000.00 USD) pursuant to the Second Amendment.

164. When Defendant failed to make payment, Laas encouraged Plaintiff to collect payment by drawing on the LC dated September 3, 2021.

165. Upon information and belief, unfortunately, when Plaintiff attempted to draw on the LC, HSBC declined to make payment to Plaintiff since the documents underlying the shipment of Gloves did not identify Defendant as the originator of the goods.

166. The Certificate of Origin submitted when Defendant attempted to draw on the LC noted clearly that Defendant was the consignor of goods and that Defendant was a "Notify Party", so it is unclear why Plaintiff was unable to draw on the LC.

167. Upon information and belief, while Laas empathized with Plaintiff's struggle, Laas discouraged Plaintiff from filing a lawsuit against Defendant.

**G. PURCHASE ORDERS & THE FIRST SHIPMENT**

168. Apart from, *arguendo*, the Test Shipment, which Defendant and Plaintiff clearly agreed did not count against the Contract's value or required quantities, Defendant only issued one single purchase order in connection with the Contract.

169. In or around September 2021, Defendant forwarded the first purchase order to Plaintiff and requested that Plaintiff repackage, prepare, and export approximately seven hundred thousand (700,000) boxes of nitrile gloves to Long Beach, California.

170. Upon information and belief, Defendant's request was based upon a purchase order from Walmart.

171. In spite of the oral agreement between the Parties prior to entering into the Contract and the conduct of the Parties during the Test Shipment, on or about September 3, 2021, Defendant, through Laas, requested that Plaintiff arrange for funding to pay the manufacturer for the gloves and boxes required for this order since Defendant had not yet paid Plaintiff's invoices.

172. Laas further assured Plaintiff, on behalf of Defendant, that Defendant would arrange for the requisite shipping containers to export the Glove shipments.

173. On September 4, 2021 at 7:16 AM MYT, Laas sent Abdullah a WhatsApp message indicating that Defendant would cancel the LC if Plaintiff did not perform under the Second Amendment.

174. On September 5, 2021 at 10:25 PM MYT, Laas sent Abdullah a WhatsApp message advising Abdullah that Defendant requires the shipment to be sent out before Defendant can remit payment.

175. Later on September 5, 2021 at 7:37 PM MYT, Laas sent Abdullah a WhatsApp message notifying Plaintiff that Plaintiff "must get 5 containers out on the 13th of September otherwise" Plaintiff would be in "default on the contract and the amendment says that the contract then becomes nill and void" and that Plaintiff would be unable to collect on the LC in that case.

176. Further on September 5, 2021 at 10:25 PM MYT, Laas sent Abdullah another WhatsApp message advising that "in 7/10 days will have the funds to do every alternative week" in reference to Defendant making payments for future shipments of Gloves.

177. Upon information and belief, in reliance upon Defendant's representations through Laas about future order volume and Defendant's needs, Plaintiff accommodated Defendant's requests and obtained the Gloves on credit with the manufacturer since Plaintiff believed that the advance payment was secured by the LC.

178. In fact, Plaintiff sourced enough Gloves to fill one million (1,000,000) Dr. Smart Boxes, all on credit from the manufacturer, in order to prepare for the future order volume Plaintiff anticipated based on Defendant's representations about upcoming order volume.

179. The value of the Gloves obtained on credit was approximately Five Million United States Dollars ($5,000,000.00 USD).

180. Further, Plaintiff repackaged and prepared approximately six hundred thousand eighty-six (686,000) boxes of Gloves which Plaintiff would later pack into seventeen (17) containers for shipping (the "First Shipment"). Plaintiff also repackaged the remainder of the one million (1,000,000) Gloves it sourced to prepare for future shipments and enhance efficiency of operations.

181. Within the purchase order from Defendant, there were ten (10) purchase order numbers, multiple glove sizes, different lot numbers, and different years associated with different gloves.

182. After the First Shipment was prepared, Defendant contacted Plaintiff to advise Plaintiff that the stickers on each box needed to reflect certain information of the gloves and needed

to correspond to the purchase order and bear the lot number and year for each box of Gloves which was repackaged.

183. Accordingly, Plaintiff unpacked and repackaged Gloves for the September Shipment.

184. Plaintiff employed sixty to seventy (60-70) workers to unpack the containers, remove the old stickers, and to adhere the correct stickers and information to each box of Gloves to be sent as a part of the First Shipment.

185. Working hours were limited due to the Covid-19 pandemic, so Plaintiff was only operable twelve (12) hours per day.

186. Upon information and belief, Plaintiff spent upwards of Two Million Five Hundred Thousand United States Dollars ($2,500,000.00 USD) re-preparing the boxes pursuant to Defendant's specifications in addition to the money Plaintiff advanced for Defendant's cost of goods.

187. Defendant continued changing the purchase order numbers until December 2021, and Plaintiff continuously had to unpack the First Shipment, remove the existing stickers, print new stickers, and apply those new stickers to the boxes in the First Shipment.

188. On October 22, 2021, despite the First Shipment not yet having been exported to the United States, Laas requested that Plaintiff issue an invoice for one million one hundred thousand (1,100,000) Dr. Smart Boxes, presumably so that Plaintiff could prepare for future orders.

189. Laas told Plaintiff that she would advance the funds for the order of gloves, most likely since Defendant had still not remitted funds to pay Plaintiff.

190. Defendant continued to assure Plaintiff that Defendant was continuing its business relationship with Plaintiff under the Second Amendment through December 2021, but it was still not sending Plaintiff containers to export the First Shipment or placing other purchase orders.

191. Plaintiff had the First Shipment and stock of Gloves sitting in its warehouse.

192. Plaintiff was waiting to ship the Gloves pending resolution of an audit at Defendant's instructions and per the terms of the Second Amendment.

193. On November 10, 2021, Laas reassured Plaintiff that Defendant would still pay Plaintiff.

194. On November 11, 2021, Abdullah advised Laas that the bank funding the LC is chasing Plaintiff and seeking proof of cause for the delays in shipments.

195. Abdullah further advised Laas that he planned to ship out the inventory in Plaintiff's possession by December 17, 2021 regardless of whether or not Defendant issued a purchase order.

196. In December 2021, Laas vaguely advised Plaintiff that Defendant may have been having some issues generally, but, upon information and belief, she never elaborated on the same nor did Laas indicate in any way that Defendant and Walmart were having any dispute.

197. Plaintiff would later learn that, on or about November 11, 2021, Walmart cancelled its contract with Defendant and halted all future orders from Defendant.

198. Defendant did not at any time in 2021 make Plaintiff aware of any dispute between Defendant and Walmart.

199. At this point, the creditors who financed Plaintiff's sourcing of the Gloves were coming after Plaintiff for repayment, and Defendant had still not made payment to Plaintiff.

200. The only way Plaintiff could satisfy the debt it assumed for Defendant would be to collect on the LC; however, Plaintiff could not do so until the First Shipment was made.

201. In or about mid-December 2021, Defendant had still not arranged for containers, nor had it made shipping arrangements for the First Shipment.

202. Ultimately, Plaintiff decided to incur the expense to ship the First Shipment, and, on December 30, 2021, Plaintiff issued Defendant invoice M075 in the amount of Four Million One Hundred Ninety-Nine Thousand United States Dollars ($4,199,000.00 USD).

203. In or about January 17, 2022, Plaintiff sent the First Shipment along with all of the documents required under the LC for Plaintiff to collect payment thereunder so that Plaintiff could repay the creditors it acquired while attempting to perform under the Second Amendment.

204. The First Shipment was collected by the freight forwarders and eventually shipped in or about January 2022.

205. After shipping the First Shipment, Plaintiff did not hear from Defendant until Defendant reached out to Plaintiff to attempt to terminate the Second Amendment.

206. On or about March 25, 2022, the First Shipment arrived in the United States.

207. Upon information and belief, the cargo was never collected by Defendant or Walmart.

208. Despite Plaintiff's best good faith efforts, Plaintiff was unable to secure a buyer to mitigate its losses; unfortunately, Plaintiff could not find an alternative.

209. The entire First Shipment was a total loss to Plaintiff.

**H. PAYMENTS MADE BY DEFENDANT TO PLAINTIFF**

210. Defendant consistently failed to satisfy its financial obligations to Plaintiff throughout the dealings between the Parties.

211. Upon information and belief, Defendant failed to make the two (2) separate Eight Hundred Fifty Thousand United States ($850,000 USD) advance payments to Plaintiff through

LLH, due under Section 2(b) of the Contract, one of which was supposed to be sent to Defendant upon signing, the other of which was supposed to be sent to Defendant after the second shipment of Gloves was exported.

212. Throughout the course of Plaintiff's dealing with Defendant, Plaintiff only received three (3) payments from Defendant, one of which was related to the Test Shipment.

213. First, upon information and belief, soon after the Parties executed the Contract, Defendant advanced a Two Hundred Thousand United States Dollar ($200,000.00) payment to Plaintiff so that Plaintiff could procure warehouse space for storage of the Gloves.

214. Second, in June or July 2021, Defendant remitted a Three Million Seventy-One Thousand Two Hundred Fifty United States Dollars ($3,071,250.00 USD) payment to Plaintiff for the Test Shipment.

215. Finally, third, in December 2021, Defendant paid Plaintiff for the printing of additional Dr. Smart Boxes.

216. Defendant has never compensated Plaintiff for the remaining, unpaid value of the Contract or the Second Amendment nor for the expenses associated with container fees, freight forwarding fees, shipping fees, warehousing, storage, preservation, customs fees, penalties, and/or disposal costs of the goods, and Plaintiff's attempts at mitigation, all of which were incurred directly from, incidentally to, and consequentially from Defendant's conduct, the Contract, and the Second Amendment.

217. Further, despite Defendant's failure to make the payments due under the Contract or the Second Amendment, Plaintiff has remained ready, willing, and able to perform its obligations under the Contract and the Second Amendment at all material times while Defendant has not only repeatedly failed to perform its obligations under the Contract or the Second

Amendment but has also interfered in Plaintiff's ability to perform its obligations under the Contract and the Second Amendment and placed unreasonable requirements upon Plaintiff, such as the social audits under the Second Amendment.

**I. INSPECTIONS & SOCIAL AUDITS**

218. Under Section 6.2.1 of the Contract, Plaintiff was subject to certain requirements for the quality and standard of Gloves it produced under the Contract and under Section 5.6 of the Contract, Plaintiff was responsible for assisting Defendant in conducting inspections of the manufacturing facilities from which the Gloves were sourced.

219. However, Defendant contacted Abdullah by email to request that Plaintiff comply with and participate in social audits for Walmart since Walmart wanted social audits of Plaintiff's premises, processes, and products in addition to the SGS inspections that Plaintiff already planned to undergo.

220. Plaintiff did not think it made sense to be audited since Plaintiff was the repackaging and exporting company not the manufacturer; however, as a gesture of good faith, Plaintiff agreed to participate in audits at Defendant's and Walmart's request.

221. While the Second Amendment required Plaintiff to comply with social audits, that agreement was wholly unsupported by consideration and was simply a vessel for Defendant to further tilt the already extremely one-side Contract in Defendant's favor.

222. Despite the circumstances, Plaintiff willingly complied with any and all audits and re-audits which Defendant requested at all material times.

223. On or about October 1, 2021, Laas acknowledged that Plaintiff was not contractually obligated to Defendant under the Contract to participate in any audits.

224. Upon information and belief, Walmart arranged for multiple audits including: a UL Solutions social audit which was to be conducted remotely and a Bureau Veritas audit which was to be conducted in person.

225. Upon information and belief, the social audits which were scheduled were meant for manufacturers of goods not for repackaging facilities.

226. Upon information and belief, each of the auditors was a Walmart representative in some capacity, and Walmart arranged for all of the audits.

227. Upon information and belief, in addition to the above-referenced audits, Walmart arranged for a SMETA audit by SGS which Plaintiff passed by or around the end of September 2021.

228. Plaintiff knew that it would not pass the UL Solutions social audit since it is not the manufacturer of the Gloves.

229. As expected, Plaintiff did not pass the UL Solutions social audit nor did UL Solutions provide feedback to Plaintiff on how it could pass the audit in the future.

230. Contrastingly, while Plaintiff also did not pass the Bureau Veritas audit, the auditor gave a list of upgrades for Plaintiff to make in order to pass a subsequent audit including adding a locked safe, upgrading the bathroom at the facility, and making other improvements to the facility.

231. Plaintiff made its best good faith efforts to make changes pursuant to the Bureau Veritas auditor's suggestions.

232. Upon information and belief, Plaintiff spent approximately over One Hundred Thousand United States Dollars ($100,000.00 USD) making repairs, changes, and improvements so that the facility would satisfy a Bureau Veritas audit.

233. Plaintiff ended up spending weeks preparing for a subsequent audit in or around November 2021.

234. Plaintiff had a social audit scheduled for some time in or around October 2021, but Laas suggested to Plaintiff that it opt for a non-audit as opposed to failing another audit since Plaintiff is not a manufacturer of Gloves.

235. Upon information and belief, Defendant continued insisting upon further audits from UL Solutions and Bureau Veritas which were scheduled for late November 2021 and were later postponed to early December.

236. Plaintiff became frustrated with Defendant's delays caused by these audits which Plaintiff was not obligated to perform under the Contract; however, on or about November 11, 2021, Laas advised Plaintiff to move forward and make shipments in accordance with the requirements of the current LC and the Second Amendment if Plaintiff cannot wait any longer to proceed with making shipments.

237. Upon information and belief, Defendant wanted Plaintiff to pass those audits before shipping any Gloves under the Contract or the Second Amendment.

238. To reiterate, although Plaintiff was not required under the Contract to do so, Plaintiff never refused any of Defendant's or its customers' requests for proper onsite inspections and accounting of all goods.

239. Further, although Plaintiff was not required under the Contract to do so, Plaintiff cleared all inspections and audit requirements that a repackaging facility could reasonably be expected to clear.

240. Also, upon information and belief, Plaintiff assisted Defendant in obtaining whatever manufacturers' certificates and audit clearances that Defendant or Walmart requested.

241. Upon information and belief, Defendant intentionally and maliciously maintained and crafted hurdles for Plaintiff to perform under the Contract and the Second Amendment by insisting that Plaintiff clear Walmart social audits before Defendant would arrange shipping containers for Plaintiff to use to export shipments of Gloves under the Contract.

242. Upon information and belief, Defendant was clearly seeking a way to relieve itself of its obligations to Plaintiff under the Contract and even the Second Amendment.

243. Upon information and belief, that is why Defendant attempted to prevent Plaintiff from delivering the cargo which Plaintiff had sourced, repackaged, secured, stored, financed, and repeatedly re-labeled for months.

244. Upon information and belief, when Plaintiff managed to finance and export the First Shipment to Defendant at Plaintiff's own cost, Defendant watered the seeds it planted throughout the impossible working relationship it created with Plaintiff to develop a false basis to terminate the Contract and the Second Amendment.

**J. DISPUTES BETWEEN WALMART AND DEFENDANT**

245. Upon information and belief, on or about November 11, 2021, Walmart officially terminated its supplier agreement with Defendant.

246. Upon information and belief, Alex Hurd ("Hurd"), a Vice President, Health for Walmart, contacted Defendant on behalf of Walmart and requested that Defendant cease production of any outstanding Gloves being prepared for Walmart.

247. Upon information and belief, Hurd advised Defendant that it was Walmart's position that Defendant had ongoing and significant issues meeting its obligations to Walmart, including delays and failure to comply with Walmart's quality standards for suppliers.

248. Upon information and belief, Hurd made clear that Walmart had no intention at this point of issuing any future purchase orders.

249. Upon information and belief, on or about November 12, 2021, Jason responded to Hurd on Defendant's behalf, and he assured Walmart that Defendant was making its best efforts to satisfy its obligations to Walmart with respect to the nitrile gloves.

250. Upon information and belief, Jason further advised Walmart that Defendant entered into multiple contracts with top glove manufacturers in Asia which include minimum purchase requirements.

251. Upon information and belief, Jason further advised Walmart that Defendant had hundreds of containers of Gloves which were ready to be shipped.

252. Upon information and belief, Jason further drew to Walmart's attention the state of the world during the Covid-19 pandemic and reminded Walmart that the government shutdowns, restrictions, factory curfews, SGS lockdowns, and other supply chain issues and Covid-19-specific protocols had to followed by Defendant's manufacturers and repackaging companies.

253. Upon information and belief, Jason further reminded Walmart that Defendant continued to keep Walmart apprised of the status of shipments since Walmart had not directly witnessed the supply chain crisis plaguing Asia as Defendant had.

254. Upon information and belief, Jason further highlighted to Walmart that there were dedicated production lines for Careglove Gloves to be manufactured for Walmart to satisfy Defendant's contract with Walmart.

255. Upon information and belief, Jason suggested to Walmart that Defendant believed Walmart's sudden desire to cancel its contract with Defendant arose from one of Walmart's largest B2B clients cancelling its order for gloves.

256. Upon information and belief, Walmart's cancellation of its agreement with Defendant was not the result of, nor was it incidental to, any act or omission of Plaintiff.

257. Upon information and belief, on June 25, 2021, Small sent Defendant a letter on behalf of Walmart stating that Walmart holds Plaintiff harmless with respect to the repackaging services Plaintiff provided Defendant and confirming that Walmart knew that Plaintiff was based in and performing repackaging of the Gloves in Malaysia.[7]

**K. TERMINATION LETTER FROM DEFENDANT**

258. On January 31, 2022, Defendant sent Plaintiff a letter to terminate the Contract and the Second Amendment ("Termination Letter").[8]

259. Plaintiff claimed that the Contract and Second Amendment were null and void because

> MNA has failed to adhere to London Luxury's customers' compliance, audit and social audit requirements, including but not limited to providing proper onsite inspections and accounting of all goods. Accordingly, pursuant to Paragraph 3 of the Second Amendment, MNA is in default of the Sales Contract and such Sales Contract is now null and void.
>
> In addition, pursuant to Paragraph 7.6 of the Original Contract, the Sales Contract is terminated for cause. MNA has failed to perform its obligations as provided in Article 6 of the Original Contract, including but not limited to MNA's failure to provide written certification of the origin of the goods, and to otherwise provide goods in accordance with the Sales Contract including that the nitrile gloves must be under Ansell® MicroTouch brand name only.
>
> London luxury terminates the Sales Contract for cause on the additional grounds that MNA has failed to adhere to Article 2, Item 12, which states that MNA is not permitted to drawdown on the Letter of Credit after payment is made. Despite payment being made in full for all goods received from MNA, we recently learned that MNA tried to drawdown 4.1 million dollars on the Letter of Credit, without any basis, in violation of the Sales Contract.

---

[7] The aforementioned letter was sent on official Walmart letterhead, and Plaintiff had no reason to suspect that the letter was illegitimate.

[8] A true and correct copy of the Termination Letter dated January 31, 2022 is attached hereto as Exhibit 4.

Ex. 4 at 1–2.

260. All of Defendant's assertions and allegations of breaches are baseless and are nothing more than excuses concocted by Defendant to justify its attempt to wrongfully terminate the Contract and to justify its non-payment of Plaintiff's invoice for the First Shipment.

261. In summary, Defendant alleged that it wished to terminate the Contract and the Second Amendment because

a. Plaintiff had allegedly failed to adhere to Defendant's customers' compliance, audit, and social audit requirements;

b. Plaintiff had allegedly failed to provide a certification of the origin of the goods;

c. Plaintiff had allegedly failed to provide Ansell Gloves; and

d. Plaintiff had allegedly wrongfully drawn down on the LC despite Defendant having purportedly made all payments due to Plaintiff in full at the time.

262. All of Defendant's purported bases for terminating the Contract and the Second Amendment were illegitimate, disingenuous, and facetious since

a. Plaintiff was not itself a manufacturer of nitrile gloves and was not obligated under the Contract to pass any such audit, though Plaintiff still spent approximately One Hundred Thousand United States Dollars ($100,000.00 USD) to comply with the requirements of the auditors sent by Walmart;

b. Plaintiff provided a certificate of origin for the Gloves to Defendant;

c. Upon information and belief, Defendant knew, at all materials times, that it did not have the requisite intellectual property rights nor was Defendant otherwise able to use, repackage, or resell Ansell Gloves in packaging Dr. Smart Boxes; and

d. Defendant repeatedly failed to satisfy its financial obligations to Plaintiff, namely by not making payment for the invoice issued to Defendant on or about December 20, 2021.

263. Plaintiff later learned that when Defendant sent the Termination Letter, Defendant and Walmart were already in a dispute and that Walmart had already suspended its purchase obligations under its agreements with Defendant.

264. Furthermore, in Defendant's own lawsuit against Walmart, Defendant argued that any irregularities in the Gloves were immaterial and either had been cured or were in the process of being cured when Walmart cancelled the contract in or about November 2021.

265. At no material time did Defendant give Plaintiff the opportunity to cure any purported defaults or defects under the Contract or the Second Amendment.

266. At no material time did Defendant attempt to amicably resolve the differences between the Parties prior to sending the Termination Letter to Plaintiff.

267. Ultimately, the reasons outlined in the Termination Letter and Defendant's "termination" of the Contract and Second Amendment were pretext for Defendant trying to relieve itself of the obligations it undertook when entering into the Contract with Plaintiff.

### L. DEFENDANT'S SUIT AGAINST WALMART

268. After Walmart's cancellation of its deal to purchase seventy-two million (72,000,000) boxes of nitrile gloves from Defendant, Defendant filed a lawsuit against Walmart for breach of contract in the New York State Supreme Court.[9]

[9] The case was later removed to the United States District Court for the Southern District of New York, Docket No. 7:22-cv-00599-CS, and then transferred to the United States District Court for the Western District of Arkansas, Docket No. 5:22-cv-05059-TLB, due to a forum selection clause.

269. On or about April 10, 2024, an Arkansas Federal jury awarded One Hundred One Million Two Hundred Eighteen Thousand Six Hundred Eighty United States Dollars ($101,218,680.00 USD) to Defendant and Three Hundred Fifty Thousand United States Dollars ($350,000.00) to Walmart after a trial over Defendant's and Walmart's dispute.

270. Defendant's arguments and the facts proved at trial in Defendant's suit against Walmart unequivocally support Plaintiff's claims against Defendant in this suit.

**M. SUITS AGAINST PLAINTIFF FOLLOWING DEFENDANT'S WRONGFUL CONDUCT**

271. Defendant's breach of its obligations to Plaintiff and fraudulent actions caused Plaintiff to be unable to satisfy its obligations to third parties with whom it was doing business in order to perform under the Contract and the Second Amendment.

272. Two Malaysian companies who manufactured the Gloves brought a suit against Plaintiff in the High Court of Malaya at Kuala Lumpur: *Onetexx Sdn Bhd & Canrich Sdn Bhd v. MNA Gloves Sdn Bhd*, Civil Suit No. WA-22NCC-325-07/2022 ("Civil Suit 325").

273. Civil Suit 325 was brought because Plaintiff was unable to satisfy its payment obligations to Onetexx Sdn Bhd and Canrich Sdn Bhd for the Gloves since Defendant never remitted payment to Plaintiff under the Contract or the Second Amendment.

274. Onetexx Sdn Bhd and Canrich Sdn Bhd obtained a judgement in Civil Suit 325 for Fifteen Million Fifty-Seven Thousand Nine Hundred and Seventy-Six Malaysian Ringgit and Twenty Sen ($15,057,976.20 MYR), which is approximately Three Million Seven Hundred Nine Thousand Seven Hundred and Seventy-Six United States Dollars and Thirty-Eight Cents ($3,709,776.38 USD) at the present exchange rate.

275. Additionally, Onetexx Sdn Bhd filed an action against Plaintiff and against Abdullah personally in the High Court of Malaya at Kuala Lumpur in Civil Suit No. WA-22NCC-579-08/2024 ("Civil Suit 579").

276. Civil Suit 579 was also brought because Plaintiff was unable to satisfy its payment obligations to Onetexx Sdn Bhd for the Gloves since Defendant never remitted payment to Plaintiff under the Contract or the Second Amendment.

277. Onetexx Sdn Bhd obtained a judgement in Civil Suit 579 for Four Million Nine Hundred One Thousand and Fifty-Seven Malaysian Ringgit and Twenty-Seven Sen ($4,901,057.27 MYR), which is approximately One Million Two Hundred Seven Thousand Four Hundred and Fifty-Four United States Dollars and Eighty-Six Cents ($1,207,454.86 USD) at the present exchange rate.

278. Due to the judgement in Civil Suit 579 and Defendant's failure to make payment to Plaintiff under the Contract and the Second Amendment, Abdullah has been forced to file for bankruptcy in the High Court of Malaya at Shah Alam in Selangor Darul Ehsan, Malaysia.

## N. PLAINTIFF'S ATTEMPTS TO AMICABLY RESOLVE THE DISPUTE PRESENTED HEREIN

279. Plaintiff reached out to Defendant, by letter on or about April 7, 2025, in an attempt to resolve the dispute.

280. In or about April 2025, Defendant expressed to Plaintiff that it would consider settling the dispute with Plaintiff but that it needed additional time before engaging in substantive settlement negotiations.

281. Upon information and belief, Plaintiff believes that Defendant likely wanted to hear the verdict in its ongoing case with Walmart before engaging in any settlement negotiations with Plaintiff.

282. On August 1, 2025, Defendant's counsel in Singapore, Aditiya Singh at White & Case Pte. Ltd. ("Singh"), sent a letter to Plaintiff's counsel in Singapore formally rejecting Plaintiff's attempts at amicably settling the matter between the Parties.

283. Upon information and belief, at some point after Singh sent the aforementioned correspondence to Plaintiff, he reached out to Plaintiff's counsel and asked for Plaintiff to give Defendant until July 31, 2025 to contemplate making a counteroffer to settle the matter or to otherwise engage in settlement negotiations with Plaintiff.

284. The end of July 2025 came and went with no settlement offer from Defendant.

285. In fact, on August 12, 2025, Plaintiff's counsel in this case, Sohela Suri of Suri Law PLLC *dba* Suri Law ("Suri") reached out to Singh and Defendant's appellate counsel in Defendant's case with Walmart to advise them that "all prior offers and demands made by my client through its former legal counsel or otherwise are hereby **revoked**" and to determine whether either attorney's firm would accept service on Defendant's behalf in this action.

286. Neither Aditya nor Defendant's appellate counsel responded to Suri's email to date.

287. Thus, the instant action ensued.

## V. <u>COUNT ONE</u>

## <u>BREACH OF CONTRACT</u>

288. Plaintiff realleges and incorporates by reference each and every allegation contained in the previous paragraphs as if set forth fully herein.

289. The Parties entered into the Contract, dated April 7, 2021.

290. The Contract is evidence of a legally binding contract between the Parties.

291. Plaintiff performed its obligations under the terms of the Contract.

292. Defendant failed to perform its obligations under the terms of the Contract.

293. Plaintiff has performed under the Contract to the best of its ability.

294. Defendant interfered in Plaintiff's ability to perform under the Contract.

295. Plaintiff has remained ready, willing, and able to perform under the Contract at all material times.

296. Defendant sustained damages as a result of Defendant's failure to perform its obligations under the terms of the Contract.

## VII. COUNT TWO
## UNJUST ENRICHMENT

297. Plaintiff realleges and incorporates by reference each and every allegation contained in the previous paragraphs as if set forth fully herein.

298. Defendant has been unjustly enriched by its wrongful termination of the Contract and by its inducement of Plaintiff's signature on the Second Amendment which is unsupported by consideration.

299. Defendant has failed to make restitution for such unjust enrichment.

300. Defendant has received the pecuniary benefits of its wrongful termination of the Contract and wrongful inducement of execution of the Second Amendment.

301. Defendant has a legal and ethical obligation to account for the benefits it received from its wrongful termination of the Contract and wrongful inducement of execution of the Second Amendment.

302. Payment for the unjust benefits received by Defendant, as a result of its wrongful termination of the Contract, has not been made to Plaintiff.

303. As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.

## VIII. COUNT THREE

### FRAUD

304. Plaintiff realleges and incorporates by reference each and every allegation contained in the previous paragraphs as if set forth fully herein.

305. Defendant made misrepresentations of facts or omissions.

306. When these misrepresentations or omissions were made, they were known to be false by Defendant.

307. Defendant made these misrepresentations or omissions with the intent to induce Plaintiff's reliance upon it.

308. Defendant had superior knowledge to Plaintiff which was not readily available, and Defendant knew that Plaintiff was acting on the basis of that mistaken knowledge.

309. Defendant had a duty to make disclosures to Plaintiff.

310. Plaintiff's reliance upon these misrepresentations of facts or omissions was justifiable.

311. Defendant is liable for all harm caused to Plaintiff.

312. Such conduct by Defendant was egregious.

313. Such egregious conduct by Defendant was directed at Plaintiff.

314. Such egregious conduct by Defendant rises to the level of moral turpitude, as it was based on deception and dishonesty.

315. As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.

316. As a direct and proximate result of Defendant's actions, Plaintiff is entitled to punitive damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court and the finder of fact enter a judgement in Plaintiff's favor against Defendant on all counts and claims as indicated above in an amount consistent with the proofs of trial, and seeks against Defendant all appropriate damage arising out of law, equity, and fact for each or all of the above counts where applicable and hereby requests that the trier of fact, be it judge or jury, award Plaintiff all applicable damages, including, but not limited to, compensatory, special, exemplary and/or punitive damages, in whatever amount Plaintiff is entitled, and all other relief arising out of law, equity, and fact, also including but not limited to

a. Compensatory damages in an amount to be determined as fair and just under the circumstances, by the tier of fact including, but not limited to, lost profits, expenses, diminished professional reputation, damage to business relationships, negative publicity, eroded customer trust, violation of Plaintiff's rights under the contractual agreements between the Parties and applicable law, and other damages to be proved;

b. Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

c. Pre-judgement and post-judgement interest;

d. Other declaratory, equitable, and/or injunctive relief including, but not limited to, a declaration that Defendant committed fraud in connection with its contract for services with Plaintiff and a declaration that the Second Amendment is legally unenforceable since Defendant fraudulently induced Plaintiff's signature on the Second Amendment by omitting material facts from Plaintiff, as appears to be reasonable and just;

e. Reasonable attorney fees, interest, and costs; and

f. Such other and further relief as this Honorable Court deems just and proper.

**Respectfully Submitted,**

Dated: January 15, 2026

**/s/ Sohela Suri___________________**
Sohela Suri
Suri Law PLLC
626 RexCorp Plaza, Suite 606
Uniondale, New York 11556
Ph.: 212.616.8488
Fax: 212.616.8480
E.: sohela@surilawpllc.com
*Counsel for Plaintiff*

Dated: January 15, 2026

**/s/ Susan J. Deith________________**
Susan J. Deith
Suri Law PLLC
626 RexCorp Plaza, Suite 606
Uniondale, New York 11556
Ph.: 212.616.8488
Fax: 212.616.8480
E.: susan@surilawpllc.com
*Counsel for Plaintiff*

## RELIANCE UPON JURY DEMAND

Plaintiff, by and through its attorneys, Sohela Suri and Susan J. Deith of Suri Law PLLC, hereby relies on the demand for a trial by jury previously asserted on all claims set forth above.

Respectfully Submitted,

Dated: January 15, 2026

**/s/ Sohela Suri___________________**
Sohela Suri
Suri Law PLLC
626 RexCorp Plaza, Suite 606
Uniondale, New York 11556
Ph.: 212.616.8488
Fax: 212.616.8480
E.: sohela@surilawpllc.com
*Counsel for Plaintiff*

Dated: January 15, 2026

**/s/ Susan J. Deith________________**
Susan J. Deith
Suri Law PLLC
626 RexCorp Plaza, Suite 606
Uniondale, New York 11556
Ph.: 212.616.8488
Fax: 212.616.8480
E.: susan@surilawpllc.com
*Counsel for Plaintiff*