***SALES PURCHASE AGREEMENT***

*Contract No. 2021/LL_W_MNA_ANSELL*

* *Pursuant to the 2015 Civil Code and its guiding documents.*
* *Pursuant to the 2005 Commercial Law and its implementing documents.*
* *Based on their functions, authority, needs and practical capabilities*

This April 7, 2021 dated Sales Purchase Agreement ("Contract") is made among the parties identified below, as follows:

**ACTICLE 1 – IDENTIFICATION OF PARTIES TO CONTRACT:**

| | | |
|---|---|---|
| **Party A - Seller Details** | *Name:* | **MNA GLOVES SDN. BHD.** a company organized under Malaysian laws (hereinafter called "Party A" or "Seller"). |
| | *Key Official:* | Mohd Nazrul Abdullah |
| | *Positions* | Managing Director |
| | *Address:* | Empire Tower, Unit B-06005, Jalan SS 16/1, 47500 Subang, Jaya, Selangor Darul Ehsan, Malaysia |
| | *Contact Numbers:* | +60123297388 |
| | *Email Address:* | nazrul2560@gmail.com |
| | | |
| **Party B – Buyer Details** | *Name:* | **London Luxury LLC** (hereinafter called "Party B" or "Buyer") |
| | *Key Officials:* | CEO London Luxury LLC (USA): Marc Jason<br>CFO London Luxury LLC (USA): Gordon Lewis<br>Director London Luxury Health Pte LTD: Mathilda Laas |
| | *Key Representatives:*<br>*Email Addresses:* | Mathilda Laas<br>fredalaas@protonmail.ch<br>Marc Jason<br>mjason@londonlux.com<br>Gordon Lewis<br>glewis@londonlux.com |
| | *Address:* | 270 North Ave, Floor 3 , New Rochelle, New York 10801 USA |
| | *Contact Number:* | Asia representative: +27 827739492<br>USA CFO: +1(508)654 0501 |

Party A and Party B, as identified above shall hereinafter be collectively called the "Parties" when making reference in this CONTRACT to both of them together; and when referring to either of the Parties separately, each shall hereinafter be called a "Party", unless within the context of this CONTRACT, specific reference is made to Party A as the "Seller" and Party B as the "Buyer".

After reaching agreement, both Parties agree to sign this Purchase and Sales Contract, inclusive of any attached Annexures, Appendixes, Schedules, and Exhibits (**"Contract"**) with the following terms:

**ACTICLE 2 – KEY ITEMS AND SCOPE OF CONTRACT:**

Key Items to understanding the scope of the Contract is set forth in the below Table of this Article 2, as follows:

| | | |
|---|---|---|
| Item 1 - Commodity Details | *Description:* | Nitrile Medical Examination Gloves under Ansell® MicroTouch brand name only. No substitutions without Buyer written approval. |
| | *Material:* | Manufactured from 100% Nitrile (Acrylonitrite – Butadiene), Latex free. |
| | *Features:* | Blue Color, Powder Free, Latex free. Disposable and Non-sterile. Use with both hands, wrists will be contoured, smooth glove surface or rough palm areas; textured fingertips; examination gloves |
| | *Origin* | Malaysia |
| | *Quality:* | EN 455, EN 374, ASTM D6319 and D6978, Grade A – FDA, 501K and CE certified. Commodity to be 100% new, completely free of dust, dirt and other debris. Second quality strictly prohibited. |
| Item 2 (a) – Price per Unit Basis | $20.55 FOB per box of 300 gloves negotiable for a contract of 5 years<br><br>Repacked for shipping: 100 pieces per box and 25 boxes per carton consisting of Ansell MicroTouch branded outer carton boxes.. .ONLY CARTONS OF ANSELL MICRO TOUCH WILL BE USED THAT IS SUPPLIED TO SELLER FOR THE QUANTITY OF THE GLOVES ORDERED.<br><br>Price includes redesigned boxes of buyer, repackaging of the gloves FOB Malaysia port。 | |
| Item 2 (b) – Initial Costs | Payments (two equal instalments of $850,000) to be transferred to London Luxury Health PTE Ltd. of which the first installment is to be made within 5 business Days of signing this contract . Second installment will be sent to London Luxury Health PTE Ltd. after delivery of the second shipment of stock. Such funds to be disbursed to Seller within 5 business days upon receipt of invoices issued to Seller for the costs following final design and printing of boxes. First payment will be deducted on week 4 invoice and second will be deducted week 8 invoice. Such funds may only be used for the design and printing of 6 million Dr. Smart boxes, the lease agreement of the warehouse at port, the initial expenses of hiring of staff for the repackaging of Buyer's products. | |
| Item 3 – Contract Quantity | 2,000,000 boxes (300 gloves per box) per month for a twelve month contract (commencing on first Shipment) with rollover to 5 years subject to termination and other provisions of this Agreement.. ( Repacked : 6,000,000 boxes per month. 100 gloves per box , 25 boxes per carton (Ansell) with a minimum shipment of 1,500,000 boxes per week (100 gloves per box). | |
| Item 4 – Contract's Gross Value | $493,200,000.00 per annum | |
| Item 5 – Packing Requirements | In Ansell Micro Touch external boxes which allows for 25x100 (glove boxes) per carton. | |
| Item 6 – Delivery Point | Factory shall deliver goods to Warehouse at Port Klang whereafter MNA Gloves will repack for collection by buyer's Freight Forwarders. | |
| Item 7 – Delivery Schedule / Units | Delivery date for the first batch: after friendly consultations between both parties, the delivery arrangement shall be arranged as follows: the delivery date for the batch shall be 28 days or sooner after the Buyer has issued a letter of credit to the Seller | |
| Item 8 – Loading Point | Malaysia ("Port Klang, Selangor") as instructed by Buyer on a delivery-by-delivery basis. | |
| Item 9 – Final Destination | United States of America ("USA") / Port of Los Angeles unless otherwise instructed by Buyer in Writing. | |

| | |
|---|---|
| Item 10 – Delivery Documents | As ascribed in Article 5, and as a requirement for receiving payment on deliveries undertaken under this Contract, it is the responsibility of Seller to provide Buyer with all of the following Delivery Documents to be issued by Ansell in the name of Buyer prior to any payment, specifically, the following:<br>A. SGS Inspection and testing reports marked "PASSED" at departing port/airport at buyer's cost.<br>B. Commercial Invoice<br>C. Packing List<br>D. Certificate of Origin<br>E. Certification of Conformity to Quality Standards<br>F. Copy of certificates issued by relevant authorities in support of Commodity's conformity to Quality Standards including copy of 510k Certificate as per as per Ansell Factory registration of Ansell Micro Touch. Bill of Lading (Air Way Bill if by air freight) to be provided by Buyer or Shipping Company. |

| | |
|---|---|
| Item 11 – Delivery Terms | Initial Delivery of Commodity shall be delivered to Buyer's appointed Shipping Company as scheduled. The Seller shall send a shipping notice 7 business days to the Buyer before delivery |
| Item 12 – Payment Terms | After the Contract has been executed by both parties, the Buyer shall open an irrevocable transferable L/C at sight within 15 business days for the amount of $41,100,000.00 ( Forty one Million, one hundred thousand United States Dollars). No drawdown on LC provided that TT Payment is made within maximum 5 business days after Buyer receives accurate Delivery Documents set forth in Item 10 and Buyer receives "PASSED" SGS report for products and documents as per item 10 above delivered to buyer. The Seller shall charge a 0.05% fine on the total amount of the Contract for each 7 day delay in opening the LC beyond 15 business days. If the delay in opening the LC continues for more than 45 business days, the Buyer shall pay a 2% fine on the total amount of the Goods.<br>Seller bears all risk of loss or damage to the goods until delivery of the goods to the shipping location. |

**ARTICLE 3 - DEFINITIONS & INTERPRETATIONS:**

3.1 Unless otherwise specified in this Contract or the context requires explanation in a different sense, the following terms will be understood and interpreted as follows:

3.1.1 **"Action"** means any demand, claim, suit, countersuit, arbitration, inquiry, proceeding, litigation or investigation arising between the Parties or in connection with any federal, state, local, foreign or international Governmental Authority or any arbitration or mediation tribunal.

3.1.2 **"Agreement"** or **Contract** " means the contractual arrangements made herein between Party A and Party B, who are more fully identified above, which was entered into under *Contract No. 2021/LL_W_MNA_ANSELL* with the intent of being legally bound to the covenants, promises, terms and conditions of this Contract, inclusive of any Annex, Appendix, Schedule and Addendum that is incorporated and made a part of this Contract in a Writing signed by the Parties.

3.1.3 **"Affiliate"** of any Person means a Person that controls, is controlled by, or is under common control with such Person. As used herein, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through ownership of voting securities or other interests, by contract or otherwise.

3.1.4 **"Ancillary Agreement"** means any agreement (excluding this Contract) or exhibit, statement, document or certificate executed and delivered in accordance with or required by this CONTRACT, and any other agreement or certificate specifically identified as an Ancillary Agreement for purposes of this Contract.

3.1.5 **"Box"** or **"Boxes"** means the retail distribution container used by Party A to comprise a capacity of 100 pieces of the Commodity as specified at paragraph 5.6 of Article 5.

3.1.6 **"Carton"** or **"Cartons"** means the wholesale distribution container used by Party A to hold a maximum 10 Boxes per Carton with a total capacity of 2,500 pieces per Carton or repacked with a total capacity of 100 pieces per box as specified at paragraph 5.6 of Article 5.

3.1.7 **"Commodity"** means the commodity as fully detailed in Item 1 of the Key Items and Scope of Contract.

3.1.8 **"Contract Quantity"** means the total amount of Contract Commodity to be transacted on a weekly basis every consecutive sixty (60) Days, starting not more than 20 days after the Initial Delivery on a simultaneous basis during the Contract Term as defined below.

3.1.9 **"Contract Term"** means the life of the Contract commencing on the Effective Date and continuing until its expiry date, liquidation or early termination as ascribed in Article 7 of this Contract.

3.1.10 **"Contract Value"** means the total estimated gross value of the Contract indicated at Item 4 which was calculated based on multiplying the Contract Quantity indicated at Item 3 times the Price on a per unit basis as delineated at Item 2 of the Key Items and Scope of Contract.

3.1.11 **"Confidential Information"** means all confidential or proprietary information, in whatever form or manner presented, which: (a) relates to a disclosing party's business or business plans, including and any discussions and proceedings relating to the Parties' Bank Coordinates (b) information is disclosed pursuant to this Contract by either Party, as applicable, and was lawfully in the recipient's possession prior to the time of disclosure and is used in connection with performance of the recipient's obligations or exercise of the recipient's rights hereunder; and (c) is: (i) disclosed in writing, electronically, or visually and is marked or stamped to indicate its confidential nature or is otherwise identified as confidential by the disclosing party at the time of such disclosure; (ii) disclosed orally and is identified as confidential by the disclosing party at the time of such disclosure and is confirmed in writing within fourteen (14) Days after such disclosure; or (iii) information, however disclosed, which should reasonably be considered to be confidential.

3.1.12 **"Days"** means calendar days, including working days and holidays; except as expressly and specifically provided in this Contract. However, if any delivery or payment date or any such other significant Day falls on either a Saturday or Sunday or any public holidays recognized under Malaysian or USA Laws, then the next day, excluding such Saturday, Sunday or public holiday shall be applied. Any reference in this Contract to a date or time shall be deemed to be such date or time in the Malaysia , unless otherwise specified. Any reference to "business Days" in the Agreement shall mean calendar days excluding weekends and holidays recognized under Malaysian or USA Laws.

3.1.13 **"Delivery Date"** and **"Delivery Schedule"** shall mean any date fixed by the Parties, on which delivery of the Commodity is to turned over to the Shipping Company, as ascribed at Item 7 of Article 2.

3.1.14 **"Delivery Documents"** has the meaning ascribed in Item 10 of the Key Items and Scope of Contract.

3.1.15 **"Delivery Point"** means the Loading Point or Party A's appointed manufacturing facilities in Port Klang, Selangor or such other agreed upon location where Party A turns over to Party B the Commodity together with the Delivery Documents over to Party B's appointed Shipping Company in Malaysian.

3.1.16 **"Delivery Terms"** has the meaning ascribed in Item 11 of the Key Items and Scope of Contract.

3.1.17 **"Effective Date"** means the starting date of the Contract which shall be the date that both Party A and Party B sign this Contract.

3.1.18 **"Final Destination"** has the meaning ascribed in Item 9 of the Key Items and Scope of Contract.

3.1.19 **"FOB"** shall have the meaning ascribed thereto in Incoterms 2010 except as expressly modified in the Contract. In case of conflict or inconsistency between Incoterms and this Contract, the express terms of the Contract shall prevail.

3.1.20 **"Governmental Authority"** means any nation or government, any state, municipality or other political subdivision thereof, and any entity, body, agency, commission, department, board, bureau, court, tribunal or other instrumentality, whether federal, state, local, domestic, foreign or multinational, exercising executive, legislative, judicial, regulatory, administrative or other similar functions of, or pertaining to, government and any executive official thereof.

3.1.21 **"Gross Unit Price"** means the total cost of each box and carton as delineated at Item 2 of Article 2, which figure is inclusive of Party A's raw material and related cost to manufacture and package the Commodity, plus distribution costs and intermediary fees incurred by Party A in connection with this Contract.

3.1.22 **"Initial Delivery"** has the meaning ascribed at Item 11 of Article 2

3.1.23 **"Intellectual Property"** means all intellectual property rights that was developed and/or owned by either Party prior to and independently of its arrangements with the other Party under this Contract throughout the world, including all Malaysia, the USA and other foreign (i) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, provisionals, renewals, reissues, re-examinations, additions, extensions (including all supplementary protection certificates) ("Patent Rights"),

(ii) trademarks, service marks, names, corporate names, trade names, domain names, logos, slogans, trade dress, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (iii) copyrights and copyrightable subject matter ("Copyrights"), (iv) rights in computer programs (whether in source code, object code, or other form), algorithms, databases, compilations and data, technology supporting the foregoing, and all documentation, including user manuals and training materials, related to any of the foregoing, (v) trade secrets and all other Confidential Information, ideas, know-how, inventions, proprietary processes, formulae, models, and methodologies, and (vi) all applications and registrations for the foregoing

3.1.24 **"Lead Time"** shall mean the time period, which is mutually agreed in Writing by the Parties, from the date of issuing a LC or PO (whichever applicable) to the actual Delivery Date.

3.1.25 **"Loading Point"** means the location where the Commodity is loaded by Buyer's appointed shipping company either onto a vessel or aircraft, depending on the discretion of Buyer's Mandate.

3.1.26 **"Packaging Requirements"** has the meaning ascribed in paragraph 5.6 of Article 5.

3.1.27 **"Party A's Bank Coordinates"** means and is intended to include separately and collectively, the bank name and the bank account and any other banking related information and details which is more fully set forth in **Annex A-2** to the extent such information is used and referred to by Party A in regards to any incoming TT for the payment of Commodity delivered pursuant to this Contract.

3.1.28 **"Party A's Custodian Coordinates"** and **"Party A's Securities Custodian"** means and is intended to include separately and collectively, the financial institution, banking and Person identified herein as the Securities Custodian, together with the bank account information and any other banking related details used by Party A in its financial related dealings with Party B pursuant to this Contract as more fully set forth in **Annex A-3.**

3.1.29 **"Party B's Bank Coordinates"** means and is intended to include separately and collectively, the bank name and the bank account and any other banking related information and details which is more fully set forth in Annex B to the extent such information is used and referred to by Party B in regards to any outgoing TTs or other type of bank activity, including without limitation, any LC or any other type of bank instrument linked to any instructions given by Party B in relationship to this Contract.

3.1.30 **"Party B's Intellectual Property"** or **"Party B's Property"** means any rights to Intellectual Property that was owned by Party B prior to and independently of its dealings with Party A under this Contract; and includes Party B's Packaging Material and all data, writings and other property in any form whatsoever, which is provided to Party A by or on behalf of Party B, and which was owned or controlled by Party B and/or its respective Affiliates pursuant to this Contract or any other Ancillary Agreement prior to being provided to or used by Party A hereunder.

3.1.31 **"Party B's Packaging Material"** means any logos or other graphics and includes any other types or forms of Party B's Intellectual Property used in connection with OEM Products if required.

3.1.32 **"Person"** means any natural person, corporation, limited liability company, partnership, joint venture, trust, business association, Governmental Authority or other fictitious entity.

3.1.33 **"PO"** means purchase orders and has the meaning ascribed in Article 5.

3.1.34 **"Quality Standards"** has the meaning ascribed at Item 1 of Article 2.

3.1.35 **"LC"** for clarity purposes the term **LC** as used in this Contract shall mean a **"Letter of Credit"** to be made available by Buyer to Seller or Seller's assigns to be used by the Parties as a financing instrument and as a payment guarantee mechanism for the support of each delivery of the Commodity under this Contract and both the SBLC must be in favour and for the benefit of Seller in accordance with the payment terms set forth at Article 4.

3.1.36 **"SGS"** means Societe General de Surveillance in Malaysia.

3.1.37 **"Shipping Company"** means any company approved by Buyer in writing to receive Commodity from Seller at a Delivery Pont for and on behalf of Buyer; and if any other Shipping Company is appointed to collect any Commodity under this Contract, Seller shall obtain Buyer's written approval upon receipt of notice from Seller setting forth the name and contact details of such other Shipping Company, not less than 2 Days prior to any scheduled delivery where such other Shipping Company will be authorized by Buyer to receive, collect and handle transportation of the Commodity at the Delivery Point

3.1.38 **"TT"** means a payment method where cash funds are transferred electronically, preferably via SWIFT MT103, in accordance with the payment terms of the Contract.

3.1.39 **"USA"** means United States of America and any of its respective territories.

3.1.40 **"USD"** means United States Dollars, the currency of the USA.**"US Law"** means any United States or non-United States federal, national, supranational, state, provincial, local or similar law (including common law),

statute, ordinance, regulation, rule, code, order, treaty, license, permit, authorization, registration, approval, consent, decree, injunction, judgment, notice of liability, request for information, binding judicial or administrative interpretation or other requirement, in each case, enacted, promulgated, issued, entered or otherwise put into effect by a Governmental Authority.

3.1.41 **"Singapore Law"** means any and all laws, decrees, decisions, circulars, statutes and other relevant legal documents issued by any State Authority of Singapore as promulgated, amended and supplemented from time to time.

3.1.42 **"Writing"** means this Contract and any notice required by this Contract as well as any appendix, amendment to this Contract and to be legally binding on either of the Parties must be written and signed by both Party A and Party B.

**3.2 Interpretations and understandings relative to this Contract, shall be applied, as follows:**

3.2.1 Invalidity: If any provision or part-provision of this Contract is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision under this clause shall not affect the validity and enforceability of the rest of this Contract.

3.2.2 Prevailing Translation: All Delivery Documents and any other documents or notices provided under or in connection with this Contract shall be in English.

3.2.3 Copies: This Contract is made in four (4) copies, with the equal validity, each Party keeps one (1) copy; and for reference purposes only the respective third-party representatives named herein for each Party shall keep one (1) copy.

**ARTICLE 4 – SUPPLY OF COMMODITY: PRICE AND PAYMENT TERMS:**

4.1 Price: The Gross Unit Price is delineated at Item 2 of Article 2 and notwithstanding any provision in this Contract or any other document to the contrary, the Parties agree that the Gross Unit Price is inclusive of Seller's raw material, plus all related costs to manufacture and package (including repackage) the Goods; however, the Gross Unit Price does not include, and Buyer is responsible for paying all freight charges, all Value added tax (**"VAT"**), duties and taxes on the import, use or sale of Commodity, all insurance on Commodity during transit, and all demurrage, storage and other charges after the Commodity is received by Buyer or Buyer's appointed Shipping Company at the Delivery Point.

4.2 LC Payment Guarantee Mechanism: Within 15 business Days of signing this Contract and provided that Seller provides Buyer with the following within 5 business Days (a) a complete chain of custody document from Ansell factory certifying that the product is manufactured by Ansell and (b) written consent from manufacturer to visit manufacturing facilities for inspection with adequate prior notice, Buyer shall issue a fully operative LC for a total value of $41,100,000.00 and unless otherwise agreed in Writing; and the LC must be opened with or confirmed by first class international bank acceptable to Seller and made in favor of the appointed entity as approved by the Seller and received for deposit at participating bank coordinates designated by Seller, subject to the follow:

4.2.1 The verbiage of the LC, unless otherwise agreed in Writing must state that the LC is irrevocable, transferable, assignable, and divisible,. Any payments made to Seller under this Contract must at all times be in the form of USD, via TT to Party A's Bank Coordinates unless otherwise designated by Seller in writing within One (1) Day prior to any such TT.

4.2.2 The provisions in this Contract which allows for payment supported by LC is not to be construed as altering, varying or qualifying Buyers obligation to pay for the Commodity when payment is due under this Contract.

4.2.3 Notwithstanding any provision in this Contract to the contrary payments for any delivery of Commodity, payment made under this Contract shall be due and payable upon Seller's receipt of notice from the Shipping Company of the arrival date of the Commodity at the port of the Final Destination, as ascribed in paragraph 5.3 of Article 5.

4.3 Bank Charges/Fees: Buyer shall be responsible for all reasonable bank fees and cost related to issuance of the LC under this Contract and any bank charges for payments made by Buyer from Party B's Bank Coordinates; and Seller shall be responsible for any bank fees, mailing, telecommunications, courier or other expenses incurred in connection with the LC, as well as all cost incurred in connection with the procuring, maintaining, handling or enforcement of the assets pledged thereunder, plus any TT for payment of the Commodity.

4.4 Price Review and Adjustments:

4.4.1 Gross Unit Price shall be fixed for one (1) year from the Effective Date. Following the expiration of the one (1) year period ("Initial Period"), the Parties acknowledge and agree that competitive market pressures may necessitate adjustments in the Gross Unit Price following the Initial Period, which adjustments will be negotiated and agreed on by the Parties in accordance with the remaining provisions of this clause 4.5.

4.5 If, during the Price Notice Period, the Parties cannot agree on the amount of any Price Change, then the current Gross Unit Price will remain in place for a period of Forty-five (45) Days from the date of the Price Notice and, after that, either Party may terminate the Agreement without penalty.

**ARTICLE 5 - DELIVERY TERMS:**

5.1 Delivery under PO: The Commodity shall be delivered by Seller to Buyer's appointed Shipping Company at the Delivery Point, along with the Delivery Documents, as follows:

5.1.1 The Parties contemplate that a PO will be placed from time to time by Buyer, incorporating by reference the terms and conditions of this Contract; and each PO may set forth the terms and conditions reflecting packaging, labelling and business requirements unique to a particular delivery, including without limitation, the exact location of the Delivery Point and the contact details of Buyer's nominated shipping company, as well as the exact date that Buyer's nominated shipping company will collect the Commodity. In the event of any contradiction between the terms and conditions of this Contract and the terms and conditions of a PO the terms and conditions of this Contract shall supersede and override the terms and conditions of any such PO to the extent of such contradiction.

5.1.2 Seller shall promptly notify Buyer of its receipt of any PO received pursuant to this Contract. Seller shall accept any PO that is materially consistent with the terms and conditions of this Contract, and shall confirm in writing its receipt of each PO within three (3) Days following receipt thereof and shall be obligated to deliver on the applicable delivery date the quantity of the Commodity as set forth in the PO on the terms set forth therein, subject to the terms and conditions of this Contract. Seller may not reject any PO unless there is a material error in the PO in which case any rejection must be received by Buyer in writing within three (3) Days from the date of the receipt thereof by Seller In no event shall Seller reject an PO due to Seller's increase forecast or an non forecasted demands for the Commodity; and in such an event, Seller shall use reasonable commercial efforts to meet the delivery dates, but the failure by Seller to meet the delivery date requested in such an event shall not be deemed (i) a breach by Seller of its obligation to provide the Commodity as contemplated by this Contract

5.1.3 Seller may make partial shipments of Commodity to Buyer.

5.1.4 The maximum Lead Time shall be 28 or sooner, unless otherwise agreed by the Parties in Writing.

5.1.5 In the event that due to causes attributable to Buyer, the Seller is unable to make delivery or Buyer is unable to accept delivery of the Commodity at the Delivery Point or Loading the following penalty shall bestowed upon the defaulting party:

**Claim:**

If the Buyer has any objection tó the goods or makes a claim, within sixty (60) days of delivery to the end customer. Non-compliance report with respect to the Quality Standards issued by SGS shall be provided. All documents leaving the factory shall be in name of the end buyer.

**Penalty:**

If the Seller fails to deliver the goods as scheduled and the delay exceeds 7 Days, the Seller shall pay the liquidated damages to the buyer. The Seller shall be charged a penalty of 0.50% of the goods shipped for every 7 days of delay. If the delay continues for 45 or more days, the Buyer shall have the right to cancel the Contract and require the Seller to pay a fine for delay in delivery. The amount of the fine shall be equal to 2% of the total contract value .

5.1.6 Upon the request of Buyer, the Seller shall use commercially reasonable efforts to: (a) accept any unplanned PO, (b) accelerate delivery dates for existing PO or forecasts, and (c) accept increases in quantities of existing PO, subject in each case to Buyer agreeing to meet any increased costs or premium charges incurred by Seller as a result of meeting such requests.

5.2 Title and Risk: Ownership, title and risk in the Commodity automatically transfers and passes from Seller to Buyer when the Commodity together with the Delivery Documents have been handed over to the Shipping Company; and Buyer's obligation to pay Seller for the Commodity at each such delivery shall become immediately due to Seller and payable by Buyer within a period of not more than one (1) Day after the Parties receive notice from the Shipping Company of the arrival of the Commodity at the port of the Final Destination; and Buyer's payment to Seller shall be based on the

Gross Unit Price and total quantities contained in the Bill of Lading, which is to be based on quantities stated in the SGS Report or other equivalent document or, where applicable, based solely on the certificate of quantity (or other equivalent document) issued at the Delivery Point. Without excusing Buyer's obligation to pay all Buyer approved shipping invoices, directly to the Shipping Company in advance of Seller's delivery of the Commodity to the Shipping Company; Buyer's payments to Seller shall also include any reimbursements invoiced by Seller for all transportation and security related costs, including without limitation all freight, insurance and any shipping costs, plus any and all costs and charges of any import taxes and any Customs clearance charges at the Final Destination. For further clarification purposes, notwithstanding any provision in this Contract to the contrary, Buyer is responsible for all shipping costs after the Commodity is delivered to the Delivery Point, and at all relevant times before that, Seller is responsible for costs of getting the Commodity to the Delivery Point. If, at no fault on the part of Seller, Buyer fails to timely pay in accordance with the payment terms herein, Seller reserves the right to change the delivery terms ascribed at Item 7 of Article 2 at any time after the initial delivery during the first 4 weeks of the Delivery Schedule, subject to approval in Writing from Buyer, and if the Parties are unable to reach an accord then either Party can terminate this Contract in accordance with Article 7, subject to sub-paragraph 7.3.3 of paragraph 7.3 of the Agreement.

5.3 Customs Clearance on Export: Seller on the account of Buyer shall handle any Customs clearance and any other documentation that may be required for the promptly and timely export of Commodity from the Delivery Point in accordance with this Contract.

5.4 Customs Clearance at Final Destination: Notwithstanding any provision in this Contract to the contrary, Buyer shall be responsible for all "end user taxes" at Final Destination and if a "pass through" cannot be accomplished, cost required to clear customs at Final Destination shall be borne solely by and for the account of Buyer; and Buyer's obligation at the Final Destination shall be for those expenses incurred to facilitate and accommodate the discharge of the goods.

5.5 Quality of Packaging: Seller must pack the Commodity in labelled containers in English, and the Commodity shall be properly and adequately packaged, labelled, and prepared for shipment by Seller from the factory of the manufacturer of the Commodity ("Factory"), in accordance with best commercial practice, to ensure that the Commodity will be free of damage while in transit. Accordingly, packaging must be adequate to allow for rough handling during transit, exposure to extreme temperatures, salt and precipitation during transit and open storage, with consideration for the type of goods and transportation mode; and Buyer reserves the right to reject and demand replacement at the Delivery Point, any shipment that is deemed by Buyer or Buyer's Mandate not to have been packaged adequately. Further, the Packing List included in the Delivery Documents provided by Buyer or its Shipping Company, must stipulate that Seller's conformity to the following Size Requirements and Packing Details:

5.6 Quality of Commodity: The quality of the Commodity will be confirmed by an inspection issued by SGS stating that the inspection has "PASSED" or such other independent international survey company agreed in writing upon in advance by the Parties, and such inspection shall be binding on both Parties in all respects, including but not limited to the replacement of faulty Commodity paid for by Seller. For clarity purposes, unless otherwise agreed to in writing such inspection must occur at nominated manufacturing factory of the Seller or such other nominated secured facilities designated by Seller. SGS report will be solely in the name of Buyer, owned by Buyer and paid for by Buyer when ownership is transferred. Ownership of clear title is fully transferred to Buyer upon full payment of each shipment. Seller is responsible for the delivery of the goods according to the specifications and inspection by SGS, payable by the Buyer. The PASSED SGS report is final and no claims whatsoever can be made after the SGS report is issued and goods transferred to the Buyer. Commodity must meet all testing protocols including SGS testing. Buyer may return to Seller any or all units of rejected goods that constitute nonconforming goods only if such goods failed the initial SGS report. Buyer may arrange with Seller to visit the factory with prior arrangement and in a timely manner. Seller agrees to hereby grants to Buyer or any pre-approved Buyer's customers access to Sellers repackaging premises and agree to assist to get permission from the manufactures of the Ansell Micro Touch – Ansell Malaysia to visit the manufacturing plant by buyer or any pre-approved Buyer's customers for the purpose of auditing Seller and manufacturer in compliance with the terms of this Agreement including the quality of the goods, manufacturer and Seller compliance with laws and regulations, or inspecting or conducting an inventory of finished goods, work-in-process or raw-material inventory. Seller agrees to cooperate fully with Buyer in connection with any such audit or inspection. Seller shall maintain, during the Term and for a period of three (2) years after the Term, complete and accurate books and records and any other financial information in accordance with GAAP.

5.7 Security Interest: Buyer hereby grants to the Seller a security interest in the Commodity, until the Buyer has paid in full for the Commodity when title changes to Buyer as aforementioned; and Buyer shall sign and deliver to the Seller any documents needed to perfect the security interest in any unpaid Commodity as is reasonably requested by Seller.

5.8 Insurance: Buyer shall provide at its own expense cargo insurance for the benefit of the consignee, such that the cargo shall be fully insured with coverage from the time of delivery of the Commodity at the specific Delivery Point until discharge of the Commodity at the Final Destination.

5.9 Claim Period: No claim(s) regarding quality or quantity received sixty (60) Days following receipt of the SGS quality or quantity report as appropriate will be taken into consideration by or deemed actionable against Seller.

**ARTICLE 6 - OBLIGATIONS AND WARRANTIES OF PARTIES:**

6.1 Obligations of Buyer:

6.1.1 To issue LC as agreed.

6.1.2 Issue timely any PO and any related invoices in full as agreed.

6.1.3 Preparing facilities to take delivery at Delivery Point, Loading Point and Final Destination.

6.1.4 Other obligations stated in this Contract.

6.2 Obligations of Seller:

6.2.1 Provide Commodity to the Buyer in the right quantities, quality, models, standards of goods in accordance with this Agreement and the certificates that the Seller has provided to the Buyer including SGS report, CE, FDA, ISO, EN 455 , 510K as well as time and place agreed in this contract. Factory 510k certificate to be provided to Buyer upon execution of this Agreement. Seller shall meet or exceed Buyer's quality standards for the goods as set forth in this Agreement and as communicated to Seller from time to time in writing.. Seller shall perform testing protocols including SGS testing, quality inspections of goods before delivery and shall provide the buyer with a copy of the testing report . All costs relating to SGS reports are for the Buyer.

6.2.2 Seller shall at all times comply with all laws applicable to this Agreement, Seller's operation of its business and the exercise of its rights and performance of its obligations hereunder. Without limitation of the foregoing, Seller shall ensure the Commodity and any related packaging, conform fully to any applicable law in the United States. Upon Buyer's request, Seller shall provide Buyer with (a) written certification of Seller's compliance with applicable laws; (b) written certification of the origin of any materials in the goods; and (c) any additional information regarding the goods requested by Seller such that Seller may comply in a timely manner with its obligations under existing contracts and law. Seller shall coordinate with the Buyer to solve problems arising during the contract performance and delivery of the Commodity.

6.2.3 Other obligations stated in this Contract.

6.3 Mutual warranties. The Parties both respectively represents and warrants to the other as follows:

6.3.1 Each has full corporate power to enter into and give effect to this Contract and to complete the transactions contemplated by this Contract.

6.3.2 Each has taken all necessary action to authorize the execution, delivery and performance of this Contract.

6.3.3 At the date of this Contract, the execution, delivery and performance of this Contract, neither Party has contravened any contractual, legal or other obligations that inhibit them from fulfilling their separate obligations and responsibilities under this Contract.

6.3.4 On execution of this Contract, both Parties respective obligations under this Contract will be valid, binding and enforceable.

6.3.5 All information given by either Party before entering into this Contract is complete and accurate, respectively.

6.3.6 The Parties will comply with all treaties and regulations of the United Nations, plus the Laws of Singapore, as the case may, be any other legislation or requirements that could be applicable to such Party relating to anti-money laundering and anti-terrorism financing; and in particular each Party represents to the other that they shall not employ in transactions involving this Contract any financial resources, assets or securities originated or derived from: (a) unlawful activity of any nature; (b) terrorists or terrorist organizations; or (c) persons or entities subject to Sanctions, and as the case may be, any other legislation or requirements that could be applicable to such Party. Either Party may terminate this Contract forthwith upon written notice to the other Party at any time, if supported by credible evidence, the other Party is in breach of any of the above representations, warranties or undertakings in this paragraph 6.3.6.

6.3.8. Any loss or damage arising from any Action shall not be indemnified by any Party if it has observed normal care; and no Party shall in any event be liable for indirect or consequential damages.

**ARTICLE 7 – TERM; TERMINATION**

7.1 Contract Term: The term of this Contract commences on the Effective Date and continues until December 31, 2025, unless it is earlier terminated pursuant to the terms of this Contract or applicable Law (the "Term"). The Initial Term of this Agreement commences on the Effective Date and continues for twelve (12) months following the first shipment of the goods unless it is earlier terminated pursuant to the terms of this Agreement or applicable Law (the "Initial Term").

7.2 Remedial Actions: Any violation of rights and obligations specified in this Contract shall be deemed a breach of contract provided that the violated Party has given a notice hereof and violating Party still fails to remedy its actual or alleged infringement within twenty (20) Days from the receipt of such notice.

7.3 This Contract shall terminate upon:

7.3.1 The fulfilment of all obligations of the Parties provided in this Contract.

7.3.2 The Parties' agreed termination of Contract prior to its expiry;

7.3.3 Other cases as specified in this Contract.

7.4 Liquidation Upon Fulfilment of Obligations: The Contract shall be deem liquidated upon the fulfilment of all obligations of the Parties and termination via subparagraph 7.3.1 of this Article 7.

7.5 Preservation of Rights: Termination of this Contract shall not prejudice any of the Parties' rights and remedies which have accrued as of termination.

7.6 Termination with Cause: During the Contract Term, either Party fails to perform its obligations as provided in Article 6, the non-breaching Party reserves the right to terminate this Contract without prejudice to other rights or remedies that it may have in equity and at law.

**ARTICLE 8: JURISDICTION AND DISPUTE RESOLUTION**

8.1 Jurisdiction: This Contract shall be governed by and construed in accordance with the laws of the Singapore, excepting for the provisions of paragraphs 8.3 under this Article 8. Accordingly, in relation to any legal action or proceedings arising out of or in connection with this Contract, each of the Parties hereby irrevocably submits arbitration in Singapore as set forth more specifically in Section 8.2. below.

8.2 Arbitration: Without limiting the applicability and effects of the provisions of paragraph 8.3 of this Article 8, any dispute or Action arising out of or in connection with this Contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International arbitration Centre (" SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this clause. The Tribunal shall consist of one arbitrator. The language of the arbitration shall be English. The decision by this arbitration shall be final and binding both parties. The fees for arbitration shall be borne by the losing Party unless otherwise awarded.

8.3. Disputed Intellectual Property Exception. With respect to any dispute or Actions in relation to issues in controversy regarding any Intellectual Property rights of Party B or any of its Customers, this Contract's applicable provisions thereto shall subject to interpretation and interpretation in accordance with the laws of, United States of America. Any dispute or Action arising out of any question regarding the formation, performance, breach, termination, validity of any provision in connection with such Intellectual Property rights of this Agreement, shall be firstly resolved by friendly negotiation by the Parties in good faith. In case either party is unwilling to settle the dispute through negotiation or if both Parties fail to reach any agreement within (30) days after the negotiation begins, either Party may submit such dispute to the competent court for a settlement. All matters arising out of or relating to such disputed Intellectual Property rights contemplated by this Contract, are governed by, and construed in accordance with, the Laws of the State of New York, United States of America, without regard to the conflict of law provisions thereof. Each Party irrevocably and unconditionally agrees that it shall not commence any Action relative to disputed Intellectual Property rights of any kind whatsoever against the other Party in any way arising from or relating to this Contract, including all exhibits, schedules, attachments and appendices attached hereto and thereto, and all contemplated transactions, including contract, equity, tort, fraud, and statutory claims, in any forum other than the United States District Court for the Southern District of New York or, if such court does not have subject-matter jurisdiction, the courts of the State of New York sitting in New York County, and any appellate court from any thereof. Each Party agrees that a final judgment in any Action involving disputed Intellectual Property is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**ARTICLE 9: FORCE MAJEURE EVENT**

Neither party shall be held responsible for any delay or failure in performance of any part of this Contract to the extent such delay or failure is caused by fire, flood, explosion, war, embargo, government requirement, civil or military authority, act of God, or other similar causes beyond its control and without the fault or negligence of the delayed or non-performing party

(hereinafter referred to as "Force Majeure Event"). The affected party shall notify the other party in writing within ten (10) days after the beginning of any such occurrences that would affect its performance. In the event of a force majeure event that exceeds ten (10) days, the Seller shall source products from an alternate source as a gesture to the buyer but it is not legally binding to complete this contract should Force Majeure occur.

**ARTICLE 10 – CONFIDENTIALITY AND INTELLECTUAL PROPERTY:**

10.1 Obligations of confidence: Where either Party receives Confidential Information from the other under this Contract the receiving Party must keep the Confidential Information confidential and not use, disclose or reproduce the Confidential Information for any purpose other than the purposes of this Contract; and, not, without consent of the non-disclosing Party in Writing, shall a receiving Party of Confidential Information disclose to any person other than its employees, subcontractors, agents, regulatory authorities and representatives who need the information for the purposes of this Contract.

10.1.1 Further permitted use and disclosure: Notwithstanding any provision in this Contract to the contrary, any recipient may use or disclose Confidential Information on a need to know basis and only to the extent necessary to: (a) comply with any law, binding directive of a regulator or a court order; or (b) obtain professional advice in relation to matters arising under or in connection with this Contract.

10.1.2 Representatives: Seller's Mandate and Buyer's Mandate shall act as liaisons between Seller and Buyer in addressing matters related to this Contact; and each Party must ensure that its employees, subcontractors, agents and representatives do not do, or omit to do anything, which if done or omitted to be done by a Party, would breach this Contract.

10.1.3 The Parties are obliged to keep all Confidential Information, confidential for the duration and at least 5 years after the expiration of this Contract.

**ARTICLE 11 – NOTICE:**

Unless the Parties agree otherwise in Writing, all notices between the Parties must be in writing and sent to the addresses and email coordinates first provided above by the Parties.

**ARTICLE 12 – INDEMNITY**

1. The term of this Agreement commences on the Effective Date and continues for twelve (12) months from the first shipment of goods unless it is earlier terminated pursuant to the terms of this Agreement or applicable Law (the "Term"). Any violation of rights and obligations specified in this Agreement shall be deemed a breach of Agreement provided that the violated Party has given a notice hereof and violating Party fails to cure its actual or alleged breach within twenty (20) business days from the receipt of such notice. In the event a breach cannot be cured as set forth above, the non-breaching party may terminate the Agreement.

2. In addition to the reasons stated above, this contract shall terminate upon:

(a) The fulfillment of all obligations of the Parties provided in this Agreement.

(b) The Parties' mutually written agreed termination of Agreement prior to its expiry; or

(c) Other cases as specified in this Agreement.

3, Termination of this Agreement shall not prejudice any of the parties' rights and remedies which have accrued as at termination.

**REPRESENTATIONS AND WARRANTIES**

1. Buyer represents and warrants that (a) it is a corporation duly organized, validly existing and in good standing under the laws of the New York; (b) it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement; (c) it has the full right, power and authority to enter into this Agreement and to perform its obligations hereunder; (d) it is in compliance with all applicable laws; (e) it has obtained all licenses, authorizations, approvals, consents or permits required by applicable laws to conduct its business generally and to exercise its rights and perform its obligations under this Agreement; and (f) all information that it has provided to Seller is true and accurate.

2. Seller warrants to Buyer as well as Buyer's customers that (the "Product Warranty"): (a) the goods will: (i) conform, in all respects, to the specifications standards, descriptions, quality requirements, performance requirements, and fit, form and function requirements furnished, specified herein; (ii) meet or exceed all FDA

and/or other U.S. governmental standards; (iii) conform with all relevant quality standards; (iv) be merchantable (as such term is defined in the UCC) and free from defects, latent or otherwise, in design, materials, and workmanship; (v) not infringe upon, violate or misappropriate the intellectual property rights of any third party; (vi) be fit and sufficient for the particular purpose intended by Buyer and its customers; and (vii) comply with all applicable laws.

3. Seller represents and warrants that each of the goods will be new and conveyed by Seller to Buyer with good title, free and clear of all liens or other encumbrances.

4. The warranty set forth in this Section is in addition to all other warranties, express, implied, statutory and common law, extends to the goods' future performance, survives Seller's delivery of the goods and termination of this Agreement, Buyer's receipt, inspection, acceptance, use of the goods and payment for the goods, and the termination or expiration of this Agreement, inures to the benefit of Buyer and its successors and assigns and customers of Buyer, and (e) may not be limited or disclaimed by Buyer.

**INDEMNIFICATION**

1. Subject to the terms and conditions of this Agreement, Seller (as "Indemnifying Party") shall indemnify, defend and hold harmless the Buyer and its officers, directors, employees, agents, affiliates, successors and permitted assigns and customers (collectively, "Indemnified Parties") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement and the cost of pursuing any insurance providers, incurred by any Indemnified Party (collectively, "Losses"), relating to ny third-party claim alleging:

(a) a breach or non-fulfillment of any of Indemnifying Party's representations, warranties, or covenants set forth in this Agreement;

(b) any negligent or more culpable act or omission of Indemnifying Party or any of its representatives (including any recklessness or willful misconduct) in connection with Indemnifying Party's performance under this Agreement;

(c) any bodily injury, death of any Person or damage to real or tangible personal property caused by the acts or omissions of Indemnifying Party or any of its representatives; or

(d) any failure by Indemnifying Party or its Personnel to comply with any applicable Laws; or

(e) that any of Indemnifying Party's intellectual property used in the design or production of the goods, or that is embodied in the goods, infringes any intellectual property right of a third party.

2. Notwithstanding anything to the contrary in this Agreement, Indemnifying Party is not obligated to indemnify or defend any Indemnified Party against any claim or corresponding Losses resulting directly from, in whole or in part from Indemnified Party's (a) gross negligence or more culpable act or omission (including recklessness or willful misconduct); or (b) bad faith failure to materially comply with any of its obligations set forth in this Agreement.

**CONFIDENTIALITY**

All non-public, confidential, or proprietary information of the Buyer, including, but not limited to, specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customers, customer lists, pricing, discounts, or rebates, disclosed by Buyer to Seller, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated, or otherwise identified as "confidential," in connection with this Agreement is confidential (including the terms of this Agreement), solely for the use of performing this Agreement and may not be disclosed or copied unless authorized by Buyer in writing. Upon Buyer's request, Seller shall promptly return all documents and other materials received from Buyer. Buyer shall be entitled to injunctive relief for any violation of this Section. This Section shall not apply to information that is: (a) in the public domain; (b) known to the Seller at the time of disclosure; or (c) rightfully obtained by the Seller on a non-confidential basis from a third party.

**INSURANCE**

During the Term and for a period of three (3) years thereafter, manufacturer ANSELL shall, at its own expense, maintain and carry in full force and effect commercial general liability insurance (including product liability), with financially sound and reputable insurers. Such insurance shall provide legal claim insurance on the gloves owned by manufacture in case of any default or accidents that may occur , if fault is related to manufacturing of the gloves.

**ARTICLE 13 – COUNTERPARTS:**

This Contract may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party. Execution of this Contract or any other documents pursuant to this Contract by facsimile or other electronic copy of a signature shall be deemed to be, and shall have the same effect as, execution by an original signature.

**ARTICLE 14 – ASSIGNMENT**

Seller may not assign any of its rights or delegate any of its obligations under this Contract without the prior written consent of Buyer. Reciprocally, without the prior written consent of Seller, Buyer may not assign any of its rights or delegate any of its obligations except to any affiliated or commonly owned entity or to any entity acquiring all or substantially all of Buyer's assets. Any purported assignment or delegation in violation of this Article 13 is null and void. No assignment or delegation relieves the assigning or delegating Party of any of its obligations under this Contract.

**ARTICLE 14 – ENTIRE AGREEMENT**

This Contract contains everything the Parties have agreed to in relation to sales and purchase of the Commodity. No Party can rely on an earlier document, or on anything said or done by any other Party (or by a director, officer, agent or employee of that Party) before this Contract was executed; and this Contract is properly executed if each Party executes either this Contract or an identical document. In the latter case, this Contract takes effect when the separately executed agreements are exchanged among the Parties.

**ACCEPTANCE AND APPROVAL** of this Contract is made by the undersigned as evidenced by their respective signatures and corporate chops below:

**FOR PARTY A - SELLER: MNA GLOVES SND BDH**

on this April 7, 2021

.......................................................................

Managing Director
Mohd Nazrul Abdullah

**FOR PARTY A :**
on this April 7, 2021

.......................................................................

Mrs. Mathilda F. C. Laas, ASIA representative officer
**LONDON LUXURY HEALTH PTE LTD**

**BUYER: LONDON LUXURY LLC**
on this April 7, 2021

.......................................................................

Mr. Marc Jason
Managing Director