UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MNA GLOVES SDN BHD,

Plaintiff,

- against -

LONDON LUXURY LLC,

Defendant.
-----------------------------------------------------------x

**OPINION & ORDER**

No. 25-CV-7619 (CS)

Appearances:

Sohela Suri
Suri Law PLLC
Uniondale, New York
*Counsel for Plaintiff*

Jeffrey M. Monhait
Emma Scully
Cozen O'Connor
New York, New York
*Counsel for Defendant*

Seibel, J.

Before the Court is Defendant's motion to compel arbitration and alternatively to dismiss. (ECF No. 19.) For the following reasons, the motion to compel is GRANTED.

## I. BACKGROUND

The following facts are taken from the Amended Complaint, (ECF No. 16 ("AC")). I recite here only the facts pertinent to the pending motion.

### A. Facts

Plaintiff MNA Gloves SDN BHD is a Malaysia-based company in the business of repackaging and exporting medical gloves. (*Id.* ¶ 2.) On February 23, 2021, Defendant London Luxury LLC and non-party Walmart Inc. entered into an agreement pursuant to which Defendant

was to supply 6,072,770 cartons of nitrile gloves to Walmart over the span of twelve months. (*Id.* ¶¶ 7, 57.) Defendant did not manufacture nitrile gloves and as such required not only a manufacturer but also a repackaging company to repackage the gloves into boxes bearing Defendant's branding and export them to the United States. (*Id.* ¶ 7.) Plaintiff and Defendant agreed that Plaintiff could assist with Defendant's repackaging and exporting needs, and negotiated the terms of an agreement. (*Id.* ¶ 8.) During negotiations, Defendant agreed that it would make payments to Plaintiff in advance of Plaintiff fulfilling purchase orders so that Plaintiff could advance the cost of the gloves and cover warehousing and storage costs. (*Id.* ¶ 9.) Defendant apparently had also expressed that it wished for Plaintiff to repackage the Ansell Limited brand of nitrile gloves, and never gave Plaintiff any indication during negotiations that it did not have the requisite intellectual property rights or licenses to repackage and resell those gloves. (*Id.* ¶¶ 10, 70.) Similarly, Defendant never stated that Plaintiff would be responsible for obtaining the intellectual property rights associated with the brand of gloves Defendant sought to have repackaged and exported. (*Id.* ¶ 69.)

The parties signed the agreement on April 7, 2021. (*Id.* ¶ 51.) It required Plaintiff to, on a monthly basis for a one-year period, store two million boxes containing 300 Ansell nitrile gloves each; repackage those gloves into boxes bearing Defendant's "Dr. Smart" branding; pack twenty-five boxes into a carton; fill shipping containers with the cartons; and export the containers to the Port of Los Angeles or another delivery point of Defendant's choosing. (*Id.* ¶¶ 11, 51.) In return, Defendant was to pay $493,200,000 total, with each box of 100 repackaged nitrile gloves costing $6.85. (*Id.* ¶ 11.) Defendant also had to secure a $41,100,000 letter of credit to secure one month of its payment obligations to Plaintiff. (*Id.*)

Other relevant provisions of the contract include a section governing termination, which provides that "any violation of rights and obligations specified in this Contract shall be deemed a breach of contract provided that the violated Party has given a notice hereof and violating Party still fails to remedy its actual or alleged infringements within twenty (20) [d]ays from the receipt of such notice." (*Id.* ¶ 84; *see* ECF No. 16-2 (the "Agreement") § 7.2.) Section 7.6 provides that the non-breaching party has the right to terminate the Agreement without prejudice to other remedies. (AC ¶ 85; *see* Agreement § 7.6.)

The contract also contains an arbitration provision, (Agreement §§ 8.1-8.3), which provides, "[I]n relation to any legal action or proceedings arising out of or in connection with this Contract, each of the Parties hereby irrevocably submits [to] arbitration in Singapore as set forth more specifically in Section 8.2 below," (*id.* § 8.1). The arbitration provision further provides:

> Without limiting the applicability and effects of the provisions of paragraph 8.3 of this Article 8, any dispute or Action arising out of or in connection with this Contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International [A]rbitration Centre ("SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this clause.

(*Id.* § 8.2.) Finally, the arbitration provision contains an exception that provides:

> With respect to any dispute or Actions in relation to issues in controversy regarding any Intellectual Property rights of Party B [(Defendant)] or any of its Customers, this Contract's applicable provisions thereto shall subject to interpretation and interpretation in accordance with the laws of [the] United States of America. Any dispute or Action arising out of any question regarding the formation, performance, breach, termination, validity of any provision in connection with such Intellectual Property rights of this Agreement, shall be firstly resolved by friendly negotiation by the Parties in good faith. In case either party is unwilling to settle the dispute through negotiation or if both Parties fail to reach any agreement within (30) days after the negotiation begins, either Party may submit such dispute to the competent court for a settlement. . . . Each Party irrevocably and unconditionally agrees that it shall not commence any Action

> relative to disputed Intellectual Property rights of any kind whatsoever against the other Party in any way arising from or relating to this Contract, including all exhibits, schedules, attachments and appendices attached hereto and thereto, and all contemplated transactions, including contract, equity, tort, fraud, and statutory claims, in any forum other than the United States District Court for the Southern District of New York . . . .

(*Id.* § 8.3.)[1]

After entering into the Agreement, Defendant failed for months to arrange for a manufacturer from which Ansell gloves could be sourced. (AC ¶ 12.) Ansell maintained at least one registered trademark and at least one registered patent in relation to its nitrile gloves, and Defendant did not have or take any steps to obtain any intellectual property rights or licenses to use, repackage or resell the Ansell gloves. (*Id.* ¶¶ 12, 93-95.) On May 27, 2021, Ansell confirmed that Defendant could not repackage and resell its gloves, requiring Defendant to identify another manufacturer of gloves. (*Id.* ¶¶ 12, 100.) On June 15, 2021, Defendant approved the use of Careglove nitrile gloves instead, and Plaintiff helped Defendant source Careglove gloves. (*Id.* ¶¶ 111-13.) Nevertheless, even after this new manufacturer had been identified, Defendant failed to issue any purchase orders under the Agreement for months. (*Id.* ¶ 12.)

In June 2021, Defendant requested that Plaintiff send a test shipment of 455,000 boxes, which Plaintiff did. (*Id.* ¶¶ 12-13, 115.) Plaintiff understood that this test shipment would not count toward the contract value or the minimum order requirements in the Agreement. (*Id.* ¶ 116.) On June 29, 2021, Plaintiff issued an invoice in the amount of $3,071,250 for the test shipment, (*id.* ¶ 117), which Defendant paid, (*id.* ¶ 118). The test shipment was delivered to Walmart in August 2021. (*Id.* ¶ 124.) On August 17, 2021, Defendant's representative

---

[1] The Agreement defines Party B as Defendant London Luxury LLC and Party A as Plaintiff MNA Gloves SDN BHD. (*See* Agreement at 1.)

confirmed that the test shipment did not count toward the total order volume contemplated by the Agreement. (*Id.* ¶¶ 125-26.)

Around this time, unbeknownst to Plaintiff, Defendant was planning to set up its own nitrile glove manufacturing operations in the United States and was conspiring with a Walmart employee to fabricate an increased purchase commitment from Walmart to optimize Defendant's own profits. (*Id.* ¶¶ 13, 131.) Defendant did not inform Plaintiff of its plans or the increased order commitment from Walmart, and instead proposed a "Second Amendment" to the Agreement as if it were a requirement to maintain the working relationship between the parties. (*Id.* ¶ 13.)[2] The Second Amendment reduced the value of the Agreement to $54,600,000; reduced the price per box of 100 gloves to $6.50; decreased the monthly volume of 100-piece boxes to be repackaged, stored, and exported to 700,000 boxes; reduced the value of the letter of credit to $9,100,000; and required Plaintiff to adhere to all of Defendant's customers' compliance, audit, and social audit requirements. (*Id.* ¶ 15.) Plaintiff received no consideration for the Second Amendment, (*id.* ¶ 16), but executed it on August 26, 2021 out of concern that Defendant would continue breaching the Agreement and not otherwise ever perform, (*id.* ¶¶ 13-14, 52). Plaintiff alleges it would not have entered into the Second Amendment if it had known about the increased commitments from Walmart to purchase gloves or that Defendant was planning to set up a competing manufacturing plant in the United States. (*Id.* ¶¶ 147-48.)

After executing the Second Amendment, Defendant rescinded or canceled a letter of credit it had obtained from Hongkong and Shanghai Banking Company ("HSBC") in the amount of $82,200,000. (*Id.* ¶¶ 161-62.) Defendant obtained a new letter of credit from HSBC in the

[2] Apparently there was no previous amendment, and the title "Second Amendment" was in error. (AC ¶ 1 n.6.)

amount of $9,100,000 pursuant to the Second Amendment on September 3, 2021. (*Id.* ¶ 163.) Around the same time, Defendant placed one purchase order under the Second Amendment. (*Id.* ¶¶ 18, 168-69.) Defendant had indicated that it would cancel the letter of credit if Plaintiff did not perform, and that the shipment had to be sent out before Defendant would remit payment. (*Id.* ¶¶ 173-74.) Defendant also advised Plaintiff that it would have the funds to make payments for future shipments in seven to ten days. (*Id.* ¶ 176.) In reliance on Defendant's representations, Plaintiff obtained financing, sourced the gloves on credit, repackaged the gloves, prepared the shipment and ultimately exported it in January 2022, (*id.* ¶¶ 19, 177-80, 195, 202-06), even though Defendant had not made shipping arrangements, because only by shipping could Plaintiff collect on the letter of credit and pay the creditors who had financed Plaintiff's sourcing of the gloves, (*id.* ¶¶ 199-203). Plaintiff issued Defendant an invoice in the amount of $4,199,000, (*id.* ¶ 202), but Defendant did not pay Plaintiff for that order and has never paid Plaintiff to procure nitrile gloves or repackage or export them aside from the test shipment, an advance provided for Plaintiff to procure warehouse space, and an amount to cover Plaintiff's expenses in printing additional Dr. Smart boxes, (*id.* ¶¶ 18-19, 213-216). Plaintiff attempted to collect payment by drawing on the letter of credit, but HSBC declined to make payment to Plaintiff because the documents underlying the shipment of gloves did not identify Defendant as the originator of the goods, even though the Certificate of Origin noted that Defendant was the consigner of goods and the "Notify party." (*Id.* ¶¶ 165-66.)

Defendant did not inform Plaintiff that on November 11, 2021, Walmart had canceled its contract with Defendant and halted all future orders. (*Id.* ¶¶ 197-98.) On January 31, 2022, after the first shipment had shipped, Defendant sent Plaintiff a letter terminating the Agreement and the Second Amendment. (*Id.* ¶ 258; *see id.* ¶ 204.) Defendant claimed that the Agreement and

Second Amendment were null and void because Plaintiff had failed to perform its duties, including by failing to adhere to Defendant's customers' compliance, audit, and social audit requirements; failing to provide a certification for the origin of the goods; failing to provide Ansell gloves; and wrongfully drawing on the letter of credit. (*Id.* ¶¶ 259, 261.)

Plaintiff alleges that as a result of Defendant's actions, it has been unable to satisfy its obligations to third parties and has been subject to suit and forced to file for bankruptcy. (*Id.* ¶¶ 271-78.)

### B. Procedural History

Plaintiff initiated this action by filing its complaint on September 14, 2025. (ECF No. 1.) On November 14, 2025, Defendant filed its pre-motion letter in anticipation of its motion to compel arbitration or in the alternative to dismiss. (ECF No. 13.) Plaintiff responded, (ECF No. 15), and on December 15, 2025, the Court held a pre-motion conference at which it granted Plaintiff leave to amend, (*see* Minute Entry dated Dec. 15, 2025). On January 15, 2026, Plaintiff filed its AC, (ECF No. 16), and the instant motion followed, (ECF No. 19).

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of [the] contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228 (2d Cir. 2016).[3] The Supreme Court has "repeatedly described the [FAA] as 'embodying a national policy favoring arbitration.'" *AT&T*

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and alterations.

*Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)). The FAA "places arbitration agreements upon the same footing as other contracts[,] . . . [b]ut it does not require parties to arbitrate when they have not agreed to do so." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012).

Section 4 of the FAA provides that "parties can petition the district court for an order directing that 'arbitration proceed in the manner provided for in such agreement.'" *Nicosia*, 834 F.3d at 229 (quoting 9 U.S.C. § 4). In such cases, courts must first determine "whether the parties have . . . agreed to arbitrate." *Schnabel*, 697 F.3d at 118; *see Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) ("[B]efore an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties."). "The burden of proving an agreement to arbitrate rests with the party seeking to compel arbitration," *ABHA Int'l, LLC v. Clover Int'l Corp.*, No. 11-CV-6841, 2012 WL 569187, at *2 (S.D.N.Y. Feb. 16, 2012), and the showing must be made by a preponderance of the evidence, *Tellium, Inc. v. Corning Inc.*, No. 03-CV-8487, 2004 WL 307238, at *5 (S.D.N.Y. Feb. 13, 2004). Then, "[i]f the [C]ourt determines that a valid arbitration agreement exists, the [C]ourt must . . . determine whether the particular dispute falls within the scope of the agreement." *Teta v. Go N.Y. Tours, Inc.*, 738 F. Supp. 3d 502, 508 (S.D.N.Y. 2024).

"Courts deciding motions to compel [arbitration] apply a standard similar to that applicable for a motion for summary judgment." *Meyer*, 868 F.3d at 74. This means that the Court "considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Id.* "[I]f undisputed facts in the record require the issue of arbitrability to be resolved against the Plaintiff

as a matter of law, then a district court must compel arbitration." *Khanna v. Am. Exp. Co.*, No. 11-CV-6245, 2011 WL 6382603, at *1 (S.D.N.Y. Dec. 14, 2011). "The district court must stay proceedings once it is satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *Nicosia*, 834 F.3d at 229; *see* 9 U.S.C. § 3.

## III. DISCUSSION

### A. Who Decides the Question of Arbitrability

The parties dispute whether Plaintiff's claims fall within the scope of the Agreement's arbitration provision. Defendant argues that it does, but that an arbitrator must decide that question. (ECF No. 20 ("D's Mem.") at 6-9.) Plaintiff, on the other hand, argues that this Court should decide whether the dispute is arbitrable. (ECF No. 23 ("P's Opp.") at 9-12.)

"A question of arbitrability is a term of art covering disputes about whether the parties are bound by a given arbitration clause, as well as disagreements about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Mobile Real Est., LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 469 (S.D.N.Y. 2020). To determine whether a dispute is arbitrable, "courts in the Second Circuit generally follow a two-part test, whereby they consider (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *Id.* Here, the parties agree that they entered into a valid arbitration agreement, (D's Mem. at 5; P's Opp. at 13; AC ¶ 290), but dispute whether Plaintiff's claims come within the scope of that agreement.

But before the Court can answer that question, it must first determine "the threshold issue of whether the Court or the arbitrator will decide arbitrability." *Cartagena Enters., Inc. v. J. Walter Thompson Co.*, No. 13-CV-4238, 2013 WL 5664992, at *3 (S.D.N.Y. Oct. 16, 2013).

"The law generally treats arbitrability as an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Pol'y Admin. Sols., Inc. v. QBE Holdings, Inc.*, No. 15-CV-2473, 2019 WL 4126464, at *5 (S.D.N.Y. Aug. 30, 2019). "Rarely, however, do arbitration agreements directly state whether the arbitrator or the court will decide the issue of arbitrability. In the absence of such clear language, courts must look to other provisions of the agreements to see what contractual intention can be discerned from them." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021).

Clear and unmistakable evidence of the parties' intent to arbitrate "includes the incorporation of the [American Arbitration Association ("AAA")] Rules into a contract. Such a contractual agreement requires both parties to submit issues of arbitrability to the arbitrator." *Cartagena Enters., Inc.*, 2013 WL 5664992, at *2. The incorporation of rules of other arbitral bodies that empower an arbitrator to decide arbitrability likewise constitutes clear and unmistakable evidence of an intent to arbitrate arbitrability. *See Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122 (2d Cir. 2003) (parties' adoption of arbitration rules of the International Chamber of Commerce in their agreement evidenced parties' intent to arbitrate arbitrability); *Mobile Real Est.*, 460 F. Supp. 3d at 470 ("When parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); *see also DDK Hotels, LLC*, 6 F.4th at 323 n.5 (no meaningful difference between NASD and FINRA codes and AAA Rules as both provide arbitrator with authority to interpret and determine applicability of code).

But "[i]ncorporation of such rules into an arbitration agreement does not, *per se*, demonstrate clear and unmistakable evidence of the parties' intent to delegate threshold

questions of arbitrability to the arbitrator where other aspects of the contract create ambiguity as to the parties' intent." *DDK Hotels, LLC*, 6 F.4th at 318. Where an agreement's arbitration provision is broad and refers all disputes to arbitration, that language, coupled with the incorporation of an arbitral body's rules, constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator. *See id.*; *see also N.Y. Knicks, LLC v. Maple Leaf Sports & Enter. Ltd.*, No. 23-CV-7394, 2024 WL 3237563, at *6 (S.D.N.Y. June 28, 2024) ("Broad language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate arbitrability."); *Cartagena Enters., Inc.*, 2013 WL 5664992, at *3 (agreement that refers "any and all" controversies to arbitration and incorporates AAA rules evinces intent to arbitrate issue of arbitrability).

> Where, by contrast, the arbitration agreement is narrower, vague, or contains exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes, incorporation of rules that empower an arbitrator to decide issues of arbitrability, standing alone, does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability.

*DDK Hotels, LLC*, 6 F.4th at 319. "In other words, when 'there is a qualifying provision (whether described as a carve-out or carve-in) that arguably excludes the present dispute from the scope of the arbitration agreement, that provision creates ambiguity regarding the parties' intent to delegate arbitrability to the arbitrator.'" *Gordon v. Wilson Elser Moskowitz Edelman & Dicker LLP*, No. 22-CV-5212, 2023 WL 2138693, at *6 (S.D.N.Y. Feb. 21, 2023) (quoting *DDK Hotels, LLC*, 6 F.4th at 322).

Here, the parties' Agreement contains a reference to the SIAC Rules, (*see* Agreement § 8.2), which state that "[t]he Tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, validity, applicability, or scope of the arbitration agreement," Singapore International Arbitration Center, *SIAC Rules 2025*, § VI, Rule

31, available at https://siac.org.sg/wp-content/uploads/2025/09/SIAC-Rules-7th-Edition_100226.pdf.

But there is also a qualifying provision in the Agreement: the exception in § 8.3 for disputes regarding the intellectual property rights of Defendant or its customers. That section provides that actions relative to disputed intellectual property rights shall be heard in the United States District Court for the Southern District of New York, and thus are not subject to arbitration. (*See* Agreement § 8.3.) Plaintiff argues that its claims fall into this exception. (P's Opp. at 12-16.)

Although a qualification in an arbitration agreement that "arguably cover[s]" a dispute "create[s] enough ambiguity to forestall a showing of clear and unmistakable intent to submit the question of arbitrability to arbitration," there is "little guidance on the degree of distinction between a provision that 'arguably' covers a dispute and one that *actually* covers the dispute." *Armor All/STP Prods. Co. v. TSI Prods., Inc.*, 337 F. Supp. 3d 156, 165 (D. Conn. 2018) (emphasis in original). Judge Michael P. Shea of the District of Connecticut has determined that "[t]he presumption of judicial determination of questions of arbitrability, coupled with [the Second Circuit's] use of the word 'arguably,' suggests that courts need not determine with certainty whether a particular dispute implicates a carve-out from arbitration in order to conclude that a question of arbitrability remains with the court." *Id.* at 166. If certainty were required, the court reasoned, "the inquiry into who should decide arbitrability would be indistinguishable from the inquiry into arbitrability itself." *Id.* I agree with Judge Shea's logic and apply it to my analysis as to whether the exception arguably covers the parties' dispute.

In other cases in which courts have found an exception did not arguably cover the dispute, it has been clear. For example, in *Gordon v. Wilson Elser Moskowitz Edelman & Dicker LLP*, the court found the arbitration clause's carve-out did not arguably cover Plaintiff's claims

for breach of the Family and Medical Leave Act, breach of contract, and disability discrimination because the carve-out excepted claims for workers compensation, state disability insurance and unemployment insurance benefits. *See* 2023 WL 2138693, at *6-7. Similarly, in *Kassim v. CVS Albany, LLC*, the arbitration provision excepted workplace disputes that did not rise to the level of litigation, including non-legal and internal disputes; pending litigation, which reflected the fact that the arbitration agreement should not have retroactive effect; and legal disputes such as claims for workers compensation, unemployment insurance, and state disability. *See* No. 21-CV-2927, 2022 WL 4357456, at *2, *11-12 (E.D.N.Y. Sept. 20, 2022). The Court held that none of these categories arguably covered Plaintiff's employment discrimination claim on the basis of race. *See id.* at *12. The court explained that Plaintiff's race discrimination claim did not fall within the category of legal disputes because the disputes listed in the arbitration provision were those for which there was already a pre-existing and well-established regulatory dispute resolution process, which is not the case for race discrimination claims. *See id.*

But here, unlike in many of those cases in which courts have found that a qualifying provision did not arguably cover the dispute, the exception does not depend on the type of claim brought. Instead, the exception applies where the dispute is "relat[ed] to issues in controversy regarding any Intellectual Property rights of [Defendant] or any of its Customers," or "relative to disputed Intellectual Property rights." (Agreement § 8.3.) As such, it seems to the Court that it cannot determine whether the exception arguably covers the parties' dispute without delving into a textual analysis of the provision and a more searching analysis of Plaintiff's allegations, which would overlap with an analysis of whether the dispute *actually* falls within the exception. And as explained, the Second Circuit must not have intended for courts to undertake such an analysis at this step. Thus, because it is not immediately clear (as it was in other cases) that the carve-out

does not even arguably cover the dispute, I find the presence of the exception to the arbitration provision creates ambiguity as to the parties' intent to arbitrate. *See Aetna Life Ins. Co. v. Bd. of Trs. of AGMA Health Fund*, No. 24-CV-1461, 2025 WL 2611947, at *3-4 (D. Conn. Sept. 10, 2025) (arbitration clause containing exception for claims for equitable relief created ambiguity as to parties' intent on issue of arbitrability and thus court decided whether parties' dispute was covered by exception without first analyzing whether provision arguably covered present dispute), *appeal filed*, No. 25-2342 (2d Cir. Sept. 26, 2025); *Querette v. Chromalloy Gas Turbine LLC*, No. 22-CV-356, 2023 WL 145014, at *4 n.3 (S.D.N.Y. Jan. 10, 2023) (fact that agreement included carve-out to arbitrability required court to determine arbitrability "irrespective of the interpretation given to the [carve-out]"); *Veerji Exps. v. Carlos St. Mary, Inc.*, No. 22-CV-3661, 2022 WL 17417277, at *3 (S.D.N.Y. Dec. 5, 2022) (court did not determine whether parties' dispute arguably fit into arbitration exception but rather determined arbitrability issue was for court because there was no clear and unmistakable evidence to contrary); *see also Downing v. A&E Television Networks, LLC*, No. 20-CV-4747, 2021 WL 4131652, at *5 (S.D.N.Y. Sept. 10, 2021) (explaining that qualifying provisions create ambiguity as to parties' intent to arbitrate arbitrability where contract contemplates one subset of claims relating to contract will be sent to arbitration and another is for the court).

Further, although the Agreement's arbitration clause incorporates the SIAC rules, (Agreement § 8.2), it does not do so in the section that exempts intellectual property disputes from arbitration, (*id.* § 8.3). "This structure suggests that the parties intended for the [SIAC] rules to apply only to those disputes that the parties agreed to arbitrate, which excludes the disputes identified in subsection [8.3]." *LAVVAN, Inc. v. Amyris, Inc.*, No. 21-1819, 2022 WL

4241192, at *2 (2d Cir. Sept. 15, 2022) (summary order). This too creates ambiguity as to the parties' intent to arbitrate arbitrability. *See id.*

Accordingly, "the Court cannot say that clear and unmistakable evidence exists that the parties intended an arbitrator to decide whether Plaintiff['s] claims are [of a kind that would fall into the exception], because [Defendant] has not offered any additional evidence of the parties' intent to submit *this* dispute to arbitration." *B & R Supermarket, Inc. v. Visa Inc.*, No. 17-CV-2738, 2024 WL 3823096, at *9 (E.D.N.Y. Aug. 14, 2024) (emphasis in original), *appeal filed*, No. 24-2344 (2d Cir. Sept. 6, 2024). Rather, because there is some ambiguity as to the parties' intent, "Defendant has not met its burden in overcoming the presumption that arbitrability should be resolved by the court and not referred to an arbitrator." *Querette*, 2023 WL 145014, at *4.

**B. Whether Plaintiff's Claims Are Arbitrable**

The Court thus turns to whether § 8.3 exempts Plaintiff's claims from the Agreement's arbitration requirement. When interpreting an arbitration agreement, a court is guided by "ordinary principles of contract interpretation to assess whether the particular dispute is covered by the language to which the parties agreed." *Aetna Life Ins. Co.*, 2025 WL 2611947, at *4; *see Querette*, 2023 WL 145014, at *4. "[W]here the agreement is ambiguous about whether it covers the dispute at hand, the court may apply a presumption of arbitrability." *Aetna Life Ins. Co.*, 2025 WL 2611947, at *4.

As mentioned, the Agreement exempts from the arbitration requirement the following: "any Action relative to disputed Intellectual Property rights of any kind whatsoever against the other Party in any way arising from or relating to this Contract, including all exhibits, schedules, attachments and appendices attached hereto and thereto, and all contemplated transactions, including contract, equity, tort, fraud, and statutory claims." (Agreement § 8.3.) It also states

that "[a]ny dispute or Action arising out of any question regarding the formation, performance, breach, termination, validity of any provision in connection with such Intellectual Property rights of this Agreement" shall first be negotiated in good faith and then submitted to a competent court for settlement. (*Id.*)

Plaintiff argues that its claims fall within the Intellectual Property exception because its dispute concerns Defendant or its customer's (Walmart's) lack of intellectual property rights to the patents and trademarks maintained by Ansell with respect to its nitrile gloves. (P's Opp. at 14.) Plaintiff further argues that Defendant's or Walmart's lack of such rights was a basis for the wrongful termination of the Agreement and thus is integral to its contract claims. (*Id.* at 14-15.) Defendant argues, however, that Plaintiff's claims do not fall within the Intellectual Property exception because Plaintiff's claims concern Defendant's lack of intellectual property rights belonging to a third party, whereas the Agreement contemplates intellectual property rights that the Defendant or its customers owned or developed prior to and independently of its arrangements with Plaintiff under the Agreement. (D's Mem. at 9-11; ECF No. 24 ("D's Reply") at 5-6.)

As Defendant explains, the Agreement defines "Intellectual Property" as "all intellectual property rights that [were] developed and/or owned by either Party prior to and independently of its arrangements with the other Party under this Contract throughout the world." (Agreement § 3.1.23.) Additionally, the Agreement defines "Party B's Intellectual Property" as

> any rights to Intellectual Property that [were] owned by Party B prior and independently of its dealings with Party A under this Contract; and includes Party B's Packaging Material and all data, writings and other property in any form whatsoever, which is provided to Party A by or on behalf of Party B, and which was owned or controlled by Party B and/or its respective Affiliates pursuant to this Contract or any other Ancillary Agreement prior to being provided to or used by Party A hereunder.

(*Id.* § 3.1.30.)

Relying on this plain language and ordinary principles of contract interpretation, the Court finds that the exception does not apply to Plaintiff's claims. Although Plaintiff is correct that pursuant to the Agreement, the claims need not be intellectual property claims relying on intellectual property law to fit within the exception, (*see* P's Opp. at 15-16), Plaintiff ignores the Agreement's definition of Intellectual Property rights. Section 8.3 capitalizes "Intellectual Property" and thus refers to the term as defined by the Agreement, and that is the definition the Court must use when interpreting the contract so long as it is not ambiguous. *See KeyBank Nat'l Ass'n v. Beauty Quest Skincare, LLC*, No. 21-CV-778, 2022 WL 1488676, at *7 (W.D.N.Y. May 11, 2022) ("[W]hen a contract defines its own terms, courts will enforce the meaning of those definitions, unless those definitions are themselves ambiguous."); *Brown ex rel. Emergent Props. Inc. v. Bldg. Engines, Inc.*, No. 21-CV-10893, 2022 WL 2532177, at *6 (S.D.N.Y. Apr. 15, 2022) (defined term carries specific definition assigned to it by the parties in the agreement and court is bound by that definition), *report and recommendation adopted*, 2022 WL 3274124 (S.D.N.Y. Aug. 11, 2022), *aff'd sub nom.*, *Brown v. Bldg. Engines, Inc.*, No. 22-2053, 2023 WL 4540565 (2d Cir. July 14, 2023) (summary order). Plaintiff does not argue that the definition of Intellectual Property is ambiguous, and I find that it is not. Thus, the Court is bound by that definition.

Reading the Agreement's definition of Intellectual Property into § 8.3, an action will fall within the exception if it relates to disputed intellectual property rights owned or developed by Defendant (or Plaintiff) prior to entering into the Agreement. But the dispute here does not relate to any intellectual property rights that Defendant actually owned prior to and independently of its obligations under the Agreement. Rather, Plaintiff's claims – to the extent

they relate to intellectual property rights at all – relate to rights that Defendant *did not* own and that Plaintiff contends Defendant was meant to obtain pursuant to its arrangements with Plaintiff. (*See* P's Opp. at 15 (citing the "non-existence of Defendant's intellectual property rights" and "Defendant's failure to acquire intellectual property rights to use and resell [Ansell] gloves"); AC ¶¶ 69, 76, 83 (discussing who would be responsible for obtaining intellectual property rights to Ansell gloves under the Agreement); *id.* ¶ 97 ("Defendant never obtained approval, a license, or otherwise permission from Ansell to use, repackage, or resell Ansell Gloves and the intellectual property associated therewith.").)[4]

"Based on the plain language of the [A]greement, [Plaintiff's] dispute is not excluded from the arbitration agreement." *Silver v. Nissan-Infiniti LT, LLC*, 724 F. Supp. 3d 217, 224 (S.D.N.Y. 2024), *reconsideration denied*, No. 23-CV-1019, 2024 WL 2055252 (S.D.N.Y. May 7, 2024). Because it does not fall under the exception, Plaintiff's claims are covered by the broad arbitration provision, which applies to all disputes arising out of or in connection to the Agreement other than those covered by § 8.3. Accordingly, the Court compels arbitration.

### C. Whether to Stay or Dismiss the Case

Defendant seeks dismissal of this case, (D's Mem. at 13), but Plaintiff requests a stay, (P's Opp. at 16). "[A] stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested." *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015). Thus, the Court shall stay the case. But Defendant also requests that the Court set a thirty-day deadline for Plaintiff to initiate arbitration and to dismiss if Plaintiff does not do so. (D's Mem. at 13-14.)

[4] Indeed, it does not appear to be a subject of dispute that Defendant held no rights in Ansell Limited nitrile gloves.

The Court will grant Defendant's request in part and require Plaintiff to initiate arbitration within sixty days to avoid dismissal.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration is GRANTED. The Clerk of Court shall stay the case, and close it for administrative purposes. It may be reopened upon request if a party wishes to seek confirmation or vacatur of an arbitration award. Plaintiff shall initiate arbitration within sixty days of this order, and shall inform the Court when it has done so. Counsel for Defendant shall provide an update as to the status of arbitration every six months thereafter.

**SO ORDERED.**

Dated: July 8, 2026
White Plains, New York

Cathy Seibel

CATHY SEIBEL, U.S.D.J.